**AMERICAN INTERNATIONAL GROUP, INC., Plaintiff–Appellant,**

v.

**AMERICAN INTERNATIONAL BANK, Defendant–Appellee.**

No. 88–5558.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 7, 1988.

Decided Feb. 14, 1991.

Stephen B. Judlowe, Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City, for plaintiff-appellant.

Joel Mark, Baker & McKenzie, Los Angeles, Cal., for defendant-appellee.

Before WALLACE, Chief Judge, POOLE and KOZINSKI, Circuit Judges.

POOLE, Circuit Judge:

I. *Overview*

Appellant, American International Group, Inc. ("the Group"), sued American International Bank ("the Bank") under the Lanham Trade Mark Act for federal trademark infringement, 15 U.S.C. § 1114(1) (1963), and false designation of origin, 15 U.S.C. § 1125(a) (1982), and, under California state law for trademark dilution, trademark infringement and unfair competition. California Business and Professional Code §§ 14330, 14400 and 17200. Appellant sought to recover damages and injunctive relief. The district court granted summary judgment in favor of the Bank on the grounds that appellant's claims were barred by laches. We reverse and remand. The Group has adduced evidence sufficient to raise factual disputes which were not amenable to summary judgment.

II. *Factual and Procedural Background*

The Group, a Delaware corporation with its principal place of business in New York, serves as a holding company for its more than 150 subsidiary corporations throughout the United States and in over 130 foreign nations. The Group is one of the largest underwriters of commercial and industrial insurance in the United States, with assets currently exceeding $21 billion and annual revenues of more than $8 billion.

▉ The Group began using the service mark "American International" in 1926.[1] Approximately eighty of the Group's subsidiaries bear names containing the words "American International"; still others utilize the abbreviations "AI" or "AIG." The Group registered the service marks "American International" and "AIG" with the

U.S. Patent and Trademark Office in October, 1975 and February, 1978, respectively. Subsequently, in 1981 and 1982, the Group reregistered those service marks to extend their use from strictly insurance underwriting purposes to also encompass a variety of additional financial services (most of which are insurance-related, such as actuarial, pension-fund, and installment loan services, and others relating to real estate).

The Group opened its first California office in San Francisco in the 1960's. The Group's presence in Los Angeles, the center of appellee's banking operations, began in 1972.

In June, 1983, Wayland Mead, in-house counsel for the Group, learned of the Bank's use of the words "American International" while browsing through a Los Angeles telephone directory. Some six months later, Mead contacted the Group's outside counsel, Roy Hopgood, requesting that he investigate the Bank. Although steps were taken to look into the matter, the Group did not warn the Bank of its alleged infringement of the "American International" service mark until January, 1986, a full two and one-half years after Mead's discovery.[2] The Group offers no excuse for this delay.

Appellee, the Bank, is a California corporation which provides commercial banking services in the Los Angeles area. Prior to initiating operations in 1978, the Bank did not conduct a search of federal trademark records to ascertain whether its name had been preempted. Nor did it attempt to register the "American International" mark with the U.S. Patent and Trademark Office.

Beginning in July 1982, the Bank sought and later obtained insurance from National Union Fire Insurance Company of Pitts-

---

1. Generally speaking, a service mark is a distinctive mark used in connection with the sale or advertising of services, such as insurance, while a trademark is typically used to identify and distinguish tangible goods. *See Black's Law Dictionary* 1228, 1338 (5th ed. 1979). Service marks are registrable in the same manner and entitled to the same protection under federal law as trademarks. 15 U.S.C. § 1053.

2. Appellee suggests that the Group had notice of the Bank's putative infringement as early as 1980 while the Group was heavily embroiled in litigation against another alleged infringing company. We disregard this belated assertion, however, since, as appellee concedes, the Bank's motion for summary judgment in this action was premised *upon the position that the Group acquired notice in 1982 at the time the Bank obtained insurance from one of the Group's subsidiary companies.*

burgh, Pennsylvania ("National Union") which, as it turns out, was actually a wholly owned subsidiary of the Group. The Bank's financial condition was at that time extremely precarious, prompting National Union and the Group's Banking Division in New York to monitor closely the appellee's financial progress. Because of the Bank's poor performance, National Union refused to renew the Bank's policy in early 1985.

By the end of 1985, however, the Bank had extricated itself from its dire financial straits and had begun to reflect a profit.[3] At about the same time, in January 1986, the Bank received a letter from Hopgood written on behalf of appellant notifying appellee of its possible infringement of the Group's service mark and requesting that the Bank change its name. In February 1986, the Bank opened a second branch office as scheduled in Alhambra, California. Appellee is currently seeking approval to open a third office in Glendale, California.

The Group brought its complaint against the Bank on June 26, 1986. The Bank counterclaimed for damages, injunctive relief and declaratory relief. Later, the Bank moved for summary judgment based on the affirmative defense of laches. The district court granted the Bank's motion and, pursuant to the parties' stipulation to dismiss the Bank's counterclaim without prejudice, entered a final judgment on December 4, 1987. The Group timely appealed.

### III. *Standard of Review*

We review *de novo* the district court's grant of summary judgment. *Pope v. Savings Bank of Puget Sound*, 850 F.2d 1345, 1356–57 (9th Cir.1988). Summary judgment is proper if, when viewing the evidence in the light most favorable to the party opposing the motion, the court determines that there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Lundy v. Union Carbide Corp.*, 695 F.2d 394, 396 (9th Cir.1982).

### IV. *Discussion*

The Group argues that material factual issues exist which should have precluded the grant of summary judgment with respect to the laches defense asserted by the Bank. Appellant contends, in the alternative, that even if the finding that laches barred the recovery of money damages was proper, the court committed error by concluding as a matter of law that appellant's claim for prospective injunctive relief was also necessarily foreclosed.

The district court may properly grant summary judgment on the basis of laches. *See Boone v. Mechanical Specialties*, 609 F.2d 956, 960 (9th Cir.1979) (upholding summary judgment of a Title VII claim on grounds of laches). "Issues concerning the correct test to be used in evaluating trademark infringement are reviewed de novo." *Clamp Manufacturing Co. v. Enco Manufacturing Co.*, 870 F.2d 512, 514 (9th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 202, 107 L.Ed.2d 155 (1989). We agree with the district court that the proper standard for evaluating this case is that enumerated in *E–Systems, Inc. v. Monitek, Inc,* 720 F.2d 604 (9th Cir.1983). In *E–Systems* we established a balancing test to be applied in examining the issue of laches which requires the district court to consider a variety of factors, including (1) the strength and value of the trademark rights asserted; (2) the senior user's diligence in enforcing the mark; (3) the harm to the senior user if relief is denied; (4) whether the junior user acted in good faith ignorance of the senior's rights; (5) the degree of competition between senior and junior users; and (6) the extent of harm suffered by the junior user because of the senior user's delay in asserting his rights. *Id.* at 607.

### A. Existence of Contested Material Facts

The district court issued an express statement of uncontroverted facts and conclusions of law on the Bank's laches de-

---

**3.** Appellee's net earnings increased from $209,-979 in 1985 to $395,266 in 1986. During a period of only the first six months of 1987, the Bank's net income had surged to $357,055.

fense. The court resolved each of the *E–Systems* factors in the Bank's favor, concluding that (1) the Group's mark is not strong since the term "American International" has commonly been employed by many companies; (2) the Group has failed to diligently police infringement of its mark since it "did nothing—intentionally or unintentionally—while [the Bank] struggled to establish itself as a viable entity, even though [the Group] probably knew of the struggle and surely knew of the existence of defendant ... at least as early as 1983, and yet it took no step to enforce its alleged rights until 1986"; (3) any prejudice accruing to the Group in the event the Bank is permitted to continue using the name "American International" is likely to be de minimis; (4) the Bank was acting in good faith ignorance of the Group's rights since even had appellee performed a trademark search before selecting its name it would only have discovered a registration restricted to insurance underwriting services, not commercial banking; (5) there is minimum competition between the two parties making it extremely improbable that consumers will confuse their services; and (6) as "a struggling entity that only recently turned the corner into profitability in the highly competitive Southern California banking world," detriment to the Bank would be extreme should the Group prevail in this litigation.

Despite the district court's extensive findings on these factors, we conclude that the entry of summary judgment on the grounds that laches was established as a matter of law was improper. First, with regard to the strength and value of the "American International" mark and appellant's diligence in protecting it, the Group presented uncontroverted evidence showing that it had utilized the "American International" name since 1926; that over 80 of its subsidiaries also use the name; that it had operated successfully under this name, amassing assets in the billions of dollars; that it has conducted extensive advertising; and that it has on many occasions attempted through litigation and otherwise to protect its service mark from infringement by companies representing a variety of financial fields, not simply infringers in the insurance industry. Although a suggestive or descriptive mark such as "American International" is inherently a weak mark, it "may be strengthened by such factors as extensive advertising, length of exclusive use, public recognition...." *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1536 (9th Cir.1989). With the material evidence it submitted, the Group has raised genuine factual disputes as to the strength and value of its mark and its diligence in protecting it.

■ The Group was unsuccessful in demonstrating present confusion stemming from the Bank's use of the term "American International." However, actual confusion is not necessary to a finding of likelihood of confusion under the Lanham Trade Mark Act. *New West Corp. v. NYM Co. of California*, 595 F.2d 1194, 1201 (9th Cir. 1979). The parties apparently agree that there is some minor overlap of their respective services. Although the parties are not direct competitors, they both provide financial services. Their businesses may be sufficiently "complementary" or "related" that the public is likely to be confused as to the source of the services. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir.1979) (high-speed waterskiing boats for racing and recreational boats for families are "related"); *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 152–55 (9th Cir.), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963) (beer and Scotch whiskey are sufficiently similar to create a likelihood of confusion regarding the source of origin when sold under the same trade name). *See also E–Systems*, 720 F.2d at 607 (mentioning that plaintiff's and defendant's products are "complementary"). Given the similarities between the services offered by the two companies, the Group could well be harmed by customer confusion, particularly if the Bank at some point plunges into its former unfortunate condition of financial instability. As the party opposing the summary judgment motion, the Group was entitled to have all inferences of this sort resolved in its favor. The Group should be

permitted to present relevant evidence at trial.

Finally, there is no demonstration in the record that the Bank was prejudiced by the Group's delay in filing its complaint. The fact that the Bank was admittedly unaware of the Group prior to the date it received a warning from Hopgood precludes the possibility of detrimental reliance.

Similarly, the record is devoid of direct evidence bearing on the likelihood and extent of injury to the Bank should the court enjoin its further use of the term "American International." Since mere delay alone generally will not constitute laches without some further showing of prejudice to the junior user, this factor is critical. *Graham v. Atchison, T. & S.F. Ry. Co.*, 176 F.2d 819, 827 (9th Cir.1949) (mere delay without injury will not give rise to laches). Consequently, it was inappropriate for the trial judge to have concluded that harm to the Bank was bound to be extreme based upon appellee's unsubstantiated projections that a major loss of goodwill would necessarily result from a forced name change.

Since five of the six *E–Systems* factors involve disputed questions of material fact, it cannot be said that, as a matter of law, the balance of the factors tips in favor of the Bank. Thus, the district court's grant of summary judgment was inappropriate.

### B. Denial of Injunctive Relief

While not directly disputing that laches can serve as a bar to injunctive relief, appellant maintains that the district court was not *required* to deny the Group's claim for injunctive relief as a matter of law simply because the issue of laches was concluded in the Bank's favor. In other words, appellant believes that the court should only have refused to afford it money damages for possible past infringement of its mark, while affording it the opportunity to recover prospective injunctive relief.

To overturn the summary judgment ruling on the basis of the Group's artfully devised argument would effectively mean that the district court was obligated to allow the Group to get to trial on the issue of injunctive relief, and consequently, that

the court's conclusion that laches applied could not preclude such relief. Such an interpretation would be contrary to the current body of law in this circuit, where it has been found that laches may bar injunctive relief in trademark actions. *See E–Systems, Inc. v. Monitek, Inc.*, 720 F.2d at 607; *Prudential Ins. Co. v. Gibraltar Financial Corp.*, 694 F.2d 1150, 1152 (9th Cir.1982), *cert. denied*, 463 U.S. 1208, 103 S.Ct. 3538, 77 L.Ed.2d 1389 (1983).

The Group's argument regarding this issue does not support reversal. However, since we have determined on other grounds that summary judgment was improperly granted, that portion of the judgment denying appellant injunctive and other relief is also vacated in order to avoid prematurely foreclosing all relief to the Group before it has been permitted to try its case.

REVERSED AND REMANDED.

KOZINSKI, Circuit Judge, dissenting:

This much is clear: American International Group and its lawyers knew defendant was calling itself American International Bank and did nothing at all for better than two and a half years. AIG sat on its hands while the Bank—a small, struggling business—built up a clientele, opened a new branch and finally turned the corner on profitability. AIG offers no excuse for its inordinate delay; yet the majority allows it to proceed with its infringement action, imposing the daunting expense of a trial on a party who has been operating under the American International mark for twelve years. This is precisely the type of case laches is meant to bar.

\* \* \*

The majority reaches the wrong result because it applies the wrong test. An issue of fact is not enough to defeat summary judgment; there must be a *genuine* issue of material fact, a dispute capable of affecting the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1985). Here, AIG raises only quibbles; each and every *E–Systems* factor favors the Bank and will favor the Bank

regardless of AIG's proof at trial. The learned district judge got it just right.

A. The first *E–Systems* factor is the strength of the mark. *E–Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983). A fanciful or made-up mark is normally strong; one that is merely descriptive or suggestive is weak. *See Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1536 (9th Cir.1989). American International is, as the district court found, largely descriptive, "a common phrase used by many businesses." Statement of Uncontroverted Facts and Conclusions of Law 7 (Oct. 22, 1987), ER 32 [hereinafter "Findings"]. It's hard to disagree: There are few terms more generic than American; it describes someone or something originating in the United States. International is an equally descriptive word, suggesting a connection with foreign trade or commerce. Nor does it take much creativity to juxtapose the two; what else does a domestic company looking for some cosmopolitan panache call itself? [1]

Not surprisingly, dozens of businesses across the country use American International as part of their name. The Manhattan phone book lists 24 entities operating under the name American International something; in Washington, D.C., there are 12 listings; in Miami 28; in Los Angeles 20; San Francisco 12; Philadelphia 10; Chicago 11; San Diego 10. Kodak or Xerox this ain't.[2]

It's true that intrinsically weak marks "*may* be strengthened" by "advertising, length of exclusive use, [and] public recognition." Majority at 832 (quoting *Accuride*, 871 F.2d at 1536) (emphasis added). It's also irrelevant: AIG has presented no evidence that it managed to elevate its mark above the cacophony of other marks that use American or International or a combination of the two. AIG's advertising

may show an effort at strengthening its mark, but what counts is success. *See First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir.1987); 1 J. Gilson, Trademark Protection & Practice § 209[5], at 2–123 (1990). This AIG has not demonstrated.

B. The second *E–Systems* factor, diligence in enforcing the mark, also strongly favors the Bank; in fact, it is conclusive. The Bank began operating under the name American International in 1978. For five years it used the name openly and notoriously in one of the country's largest business communities, but AIG failed to identify the alleged conflict. Worse, in 1982 an AIG member company underwrote the Bank's directors' and officers' insurance; no one was troubled by the similarity in the marks. Findings 4, ER 29.

Companies expecting judicial enforcement of their marks must conduct an effective policing effort, which may include training employees to detect infringers. Were we, nevertheless, to excuse AIG's underwriters for failing to ring the bell on the Bank's potential infringement, we surely cannot shut our eyes to similar inaction by plaintiff's lawyers. AIG's general counsel noticed the Bank's name in the Los Angeles telephone book in June 1983 but did nothing at all for six months, at which time he sent the information to AIG's trademark counsel. *Id.* at 5, E.R. 30. Trademark counsel must not have seen a menace to AIG's mark either, as he took no action for two more years—not even so much as a letter of inquiry.

The majority admits that AIG offers "no excuse" for this two and a half year delay, majority at 830, but nevertheless concludes that AIG has raised a genuine issue of fact as to diligence. *Compare* majority at 830 with *id.* at 832. But the only evidence of diligence the majority can muster is that

---

1. This is exactly why the Bank chose it. As the Bank's founder and first president explained, American "reflect[s] the strength and integrity of our country" and International recalls "the cultural and ethnic diversity of our shareholders, our potential customers, and the Los Angeles community in which we intended to do business." CR 36, at 2.

2. That AIG has sued a lot of other businesses cuts both ways. It suggests diligence but also demonstrates how nondistinctive the mark really is. *See Plus Prods. v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1005 (2d Cir.1983).

AIG has enforced its mark against other parties. *Id.* at 832. My colleagues do not explain how diligence against unrelated entities can defeat the Bank's laches defense once the Bank conclusively establishes that AIG was not diligent as to *it.* Diligence as to third parties might have some relevance where, despite vigorous enforcement efforts, a particular infringer remains undetected. But here we are dealing with a two and a half year post-discovery delay. How enforcement efforts against third parties can show diligence as to the Bank under these circumstances is beyond me.

The fundamental premise of laches is that those who sleep on their rights surrender them; if you snooze, you lose. Here, the claimed infringement took place under AIG's nose for eight years; three and a half years before it filed suit, AIG began doing business with the Bank; and for two and a half years, AIG's lawyers knew of the infringement but did nothing. Having chosen two words that accurately describe thousands of businesses, AIG could expect others to be equally uninspired in their selection of a trade name. To preserve its rights, AIG was required to be especially diligent in policing its mark; instead, AIG was especially lackadaisical.

C. The third and fifth *E–Systems* factors, harm to the senior user and the existence of competition between the senior and junior users, go to one issue: whether the public is likely to be confused by the similarity in names. The majority concedes there's no proof of *actual* confusion. Majority at 832. This is especially significant given that AIG and the Bank operated in Los Angeles, side-by-side, for eight years.

In all that time, AIG has been able to document not a single instance of confusion, not so much as a misdirected phone call.[3] Lack of actual confusion during such a substantial period of concurrent use in the same geographic market establishes there is no likelihood of confusion; if confusion were a real problem, it would have happened already. *Plus Prods. v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1006 (2d Cir.1983);[4] 3A R. Callman, The Law of Unfair Competition, Trademarks & Monopolies § 20.06, at 27, § 20.61, at 498 (4th ed. 1983); *see Prudential Ins. Co. v. Gibraltar Fin. Corp.,* 694 F.2d 1150, 1156 (9th Cir.1982), *cert. denied,* 463 U.S. 1208, 103 S.Ct. 3538, 77 L.Ed.2d 1389 (1983). Not even AIG's employees were confused, unless they thought they were selling insurance to themselves. *See* SER 7–9.[5]

This lack of confusion is not surprising, as AIG and the Bank are not competitors: AIG is not authorized to act as a commercial bank and has no plans to diversify in that direction, Findings at 6, 9, ER 31, 34; the Bank does not sell insurance, *id.* at 5, ER 30. Moreover, providers of commercial banking and insurance services do not compete even indirectly; having a bank account does not materially reduce one's need for insurance nor vice versa.

The majority nonetheless suggests there might be confusion because the Bank and AIG both provide "financial services." Majority at 832. All this proves is that, if you define the product market broadly enough, you can encompass any number of businesses, no matter how little they compete with each other. American Cab, American Airlines and American Motors all

---

3. Misdirected inquiries by consumers, advertisers and suppliers are common signs of public confusion about the source of a trademark. *See, e.g., International Kennel Club v. Mighty Star, Inc.,* 846 F.2d 1079, 1090–91 (7th Cir.1988); *Mustang Motels, Inc. v. Patel,* 226 U.S.P.Q. 526, 527 & n. 1 (C.D.Cal.1985).

4. In *Plus Products,* the Second Circuit relied on the absence of confusion during a three year period of concurrent use. 722 F.2d at 1006. The case here is even more compelling: Over eight years went by without a single documented instance of confusion.

5. On this issue, AIG is caught in a double bind from which it cannot possibly extricate itself at trial. If it comes up with proof that it received complaints from confused consumers during the eight years it and the Bank operated side by side, it will have to explain why it did not press its claim earlier. If it turns out that there were no complaints—as almost certainly there were not—there is no confusion. The Bank wins either way, so why put the parties through the agony of a trial?

provide "transportation services," but no one is likely to call American Cab for a ride from New York to London; American Telephone & Telegraph and American Broadcasting Company both provide "mass communication services," but ABC cheerfully carries AT & T's advertising; the American Civil Liberties Union, the American Legion and the American College of Foot Surgeons are all fairly characterized as "public service organizations," yet I rather doubt the ACLU gets a lot of calls about podiatry. Most people know the difference between a bank and an insurance company; I doubt they will be confused just because my colleagues have come up with a term fuzzy enough to cover both institutions.

The crux of plaintiff's case seems to be, not that AIG and the Bank compete now, but that they may compete at some time in the future. This is pretty thin stuff given that the prejudice to AIG is hypothetical and contingent rather than immediate and concrete; it's so thin that our caselaw rejects it outright. *Prudential Ins. Co.*, 694 F.2d 1150, involved a similar struggle between an insurance company and a financial institution. At stake was Gibraltar Financial Corporation's right to use the Rock of Gibraltar, Prudential's longtime logo. Prudential challenged the district court's finding of no competition, contending that it and Gibraltar were both selling insurance and that, given the prospect of deregulation, they would "soon compete in a wide variety of services." *Id.* at 1155. We held that "[t]he mere possibility of future competition is too tenuous a basis on which to reverse the district court.... *[T]he growth of the companies and the changes in their services do not create a basis for relief.*" *Id.* (emphasis added).

AIG has a far weaker claim than did Prudential. Because the Rock of Gibraltar has only a very tenuous relationship to financial services, it's a relatively strong mark; it is descriptive only in a remote and metaphorical way. Strong marks are sometimes protected against use on noncompeting goods; weak marks never are. 3A R. Callman, *supra* p. 835, § 20.43, at 345 ("*Only* a strong mark will be protected against the defendant's use on noncompet-ing goods." (emphasis added)); *id.* ("If a mark is weak, its protection may have an extremely narrow scope and may even be limited to similar goods similarly market-ed."); *see AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 350 (9th Cir.1979); 1 J.T. McCarthy, Trademarks and Unfair Competition § 11.26, at 512 (2d ed. 1984). As we explained over 50 years ago:

> One who devises a new, strange ... word to describe his wares may ... by timely suit prevent[ ] others from taking his word or set of words to gild the repute of even wholly different goods ... but one who takes a phrase which is the commonplace of self-praise ... must be content with that special field which he labels with so undistinctive a name.

*Treager v. Gordon–Allen, Ltd.*, 71 F.2d 766, 768 (9th Cir.1934), (quoting *France Milling Co. v. Washburn–Crosby Co.*, 7 F.2d 304, 306 (2d Cir.1925)), *quoted in* 3A R. Callman, *supra* p. 835, § 20.43, at 345. Because AIG's mark is weak, *see* p. 834 *supra*, the protection to which it is entitled is necessarily limited to the area in which it operates, namely insurance; it does not extend to banking.

Particularly significant is the district court's uncontroverted finding that, when the Bank opened its doors, AIG's registration listed insurance underwriting as its only vocation; AIG claimed no rights in the amorphous area of "financial services." *See* Findings at 8–9, ER 33–34. Registration does not establish the exclusive right to use a mark; it is, however, evidence of that right. *See* 15 U.S.C. § 1057(b); *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 48 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); 1 J. Gilson, *supra* p. 834, § 4.01. The absence of registration indicates that AIG itself did not consider its rights as extending beyond insurance underwriting. Moreover, the absence of registration deprived other businesses, such as defendant, of constructive notice of AIG's claim. *See id.* § 4.02.

The majority is right, of course, that the party opposing summary judgment is entitled to the benefit of all reasonable infer-

ences. Majority at 832. But inferences cannot be drawn from thin air; they must be based on evidence which, if believed, would be sufficient to support a judgment for the nonmoving party. *See Celotex v. Cattret*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (party with burden of proof at trial must come forward with evidence sufficient to sustain a verdict in its favor). AIG has produced nothing to prove it competes with the Bank or is harmed by the Bank's use of the mark; everything in the record is to the contrary. These *E–Systems* factors also favor the Bank.

D. Plaintiff didn't deny the Bank was unaware of AIG's claim that its mark extended to banking services. How could it have? Had the Bank performed a trademark search before selecting its name, it would have found that AIG had claimed rights only in insurance underwriting services. Findings at 8–9, ER 33–34; *see* p. 836, *supra*. The majority does not dispute that this fourth *E–Systems* factor favors the Bank.

E. Finally, the majority finds a triable issue of fact as to the sixth *E–Systems* factor, prejudice to the Bank caused by AIG's delay. My colleagues suggest that, because the Bank was unaware of AIG's existence, there was no "detrimental reliance." Majority at 833. But the Bank is not claiming estoppel; it's claiming laches —i.e., that it was harmed by AIG's lack of diligence. Estoppel requires detrimental reliance; laches does not. Indeed, in *E–Systems*, we found laches notwithstanding the fact that the defendant was unaware of the senior user's existence. *E–Systems*, 720 F.2d at 607.

Unlike my colleagues, the district court properly looked to the harm occasioned by AIG's unjustified delay, finding that the Bank "is a struggling entity that only recently turned the corner into profitability in the highly competitive Southern California banking world, and it would be dealt a severe blow if all of its hard-earned good will were stripped from it in this litigation." Findings at 9, ER 34. The majority dismisses this finding as "unsubstantiated"

but gives no citation to the record. Majority at 833. In fact, the record contains much that supports, and nothing that controverts, the district court's finding.

In 1983, the Bank was—in AIG's words —"another lousy small California Bank that lost over a million last year [with] negative undivided profits." CR 38, at 123; *see* SER 7. But AIG did not warn the Bank of its infringement claim back then, when a name change would have cost the Bank relatively little by way of reputation or good will; instead AIG waited—and underwrote the Bank's directors' and officers' liability insurance. CR 38, at 141; *see* SER 8–9. Did AIG say anything about its infringement claim in 1984, when the Bank lost another $2.3 million? No. Or in 1985, when the FDIC became concerned about the Bank's stability and required it "to correct unsatisfactory conditions?" No. *See* CR 37, at 2–3. AIG, fully aware of the Bank's name and its struggle, did nothing, year after year after year.

The Bank's horizons had begun to brighten by the beginning of 1986: It turned the corner on profitability, got approval to open a new branch and corrected all its deficiencies to the FDIC's satisfaction. More importantly, the Bank's customer base swelled: Loans grew by 62% to $31 million and deposits increased by 25% to $43 million. CR 37, at 3. It was only then—after the Bank had been in business eight years and had spent untold dollars establishing itself, developing a customer base and opening a new branch—that AIG first asserted its claim.

If these facts, none of which are controverted, fail to establish prejudice, what will? Trademark law is, after all, premised on the notion that what a business calls itself makes a difference because, within its niche, the name becomes synonymous with the business itself. As the leading treatises on trademark law explain, the "[g]ood will of a business and its symbol, a trademark, are inseparable." 1 J.T. McCarthy, *supra* p. 836, § 2.7, at 69; *accord* 1 J. Gilson, *supra* p. 834, § 1.03[5], at 27–28 ("[Trademarks] are inextricably bound up with [good will], and they are

protected *because* of it." (emphasis in original)). Surely the district court was correct when it concluded that stripping the Bank of its "hard-earned good will" would deal it "a severe blow." Findings at 9, ER 34.

Had AIG made its claim earlier, the Bank could have chosen to plough a different furrow. A change of name now, at the very least, will require a costly consumer reeducation campaign; it will also, almost certainly, undermine consumer confidence by suggesting the Bank is financially unstable and was forced to change names because it was taken over by another entity. Public confidence in our financial institutions has been severely shaken; changing the Bank's name will no longer be as simple as making a new sign for the front door and ordering new stationery. This factor, like all the others, strongly favors the Bank.

\* \* \*

A dispassionate reading of the record leads to only one conclusion: All the *E-Systems* factors favor the Bank. But even if some of the factors were to favor AIG, summary judgment would still be proper. *E-Systems* contemplates a balance, 720 F.2d at 607; to avoid summary judgment, AIG must point to disputes of sufficient weight and number that the entire balance could tip in its favor. It hasn't even come close. My colleagues conclude that summary judgment was improper because "five of six *E-Systems* factors involve disputed issues of material fact," majority at 833, but surely *E-Systems* contemplates more than simple bead-counting. The issue is not *how many* factors favor each party but their *weight*. The majority fails to explain how the balance could possibly tip in AIG's favor once the Bank has shown that AIG's lawyers sat around contemplating their navels for two and one half years while the Bank was struggling to build up its good will. Nothing AIG has proffered can overcome this hard fact. We should save everyone the time and expense of a trial by putting this case out of its misery now.