**FLIR SYSTEMS, INC., an Oregon corporation, Plaintiff,**

v.

**SIERRA MEDIA, INC., a Washington corporation, and Fluke Corporation, a Washington corporation, Defendants.**

**No. 3:10–cv–00971–HU.**

United States District Court, D. Oregon, Portland Division.

Aug. 8, 2013.

Devon Zastrow Newman, Schwabe, Williamson & Wyatt P.C., Portland, OR, for Plaintiff FLIR Systems, Inc.

William A. Brewer III, John W. Bickel II, Michael J. Collins and Robert M. Millimet, Bickel & Brewer, Dallas, TX, for Plaintiff FLIR Systems, Inc.

Kenneth R. Davis II and Parna A. Mehrbani, Lane Powell P.C., Portland, OR, for Defendant Fluke Corporation.

Dane H. Butswinkas and Matthew V. Johnson, Williams & Connolly LLP, Washington, DC, for Defendant Fluke Corporation.

Benjamin N. Souede and David H. Angeli, Angeli Law Group LLC, Portland, OR, for Defendant Sierra Media, Inc.

## OPINION AND ORDER

HUBEL, United States Magistrate Judge:

If ever there were a case where the Court hoped that the "parties [would just decide] to chill," *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 908 (9th Cir.2002), this would be it. Indeed, it is an understatement to say that this case has been hotly contested, or that there is some animosity between the two business competitors involved. The parties have had a multitude of disagreements long before this case, and their contentious relationship resulted in protracted litigation here and acrimonious discovery disputes. Tit-for-tat arguments were raised at every conceivable opportunity. Conferral did not always occur. At one point, the Court was compelled to remind counsel to be courteous and professional in their dealings with one another. And the kitchen-sink approach to trial, offering every conceivable piece of evidence and raising as many objections as possible, led to laborious, seemingly never-ending pretrial sessions to resolve the raft of unfocused issues raised by the parties. To adapt an old saying, "Too many lawyers spoil the case."

In December 2012, the Court conducted a nine-day jury trial on Plaintiff FLIR System, Inc's ("FLIR") claim of false advertising and on Defendant Fluke Corporation's ("Fluke") counterclaims of false advertising (six counts), trademark infringement, and unfair competition. The jury returned a verdict in favor of FLIR on its false advertising claim and awarded $103,000 in damages. The jury also returned a verdict in favor of Fluke on all but three counts of false advertising and awarded $4,136,975 in damages. In January and February 2013, the parties filed the following post-trial motions which are now before the Court: (1) Fluke's redaction request; (2) Defendant Sierra Media's ("Sierra") motion for an award of attorney's fees pursuant to 15 U.S.C. § 1117(a); (3) Fluke's motion re: post-trial issues; and (4) FLIR's motion for post-trial relief, judgment as a matter of law, or alternatively, for a new trial.

## I. LEGAL STANDARD

### A. Judgment as a Matter of Law

Under Federal Rule of Civil Procedure ("Rule") Rule 50(b), a party who has moved for judgment as a matter of law ("JMOL") at the close of all the evidence may renew the motion after entry of judgment. Fed.R.Civ.P. 50(b). However, "[a] party cannot raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion."

*Freund v. Nycomed Amersham,* 347 F.3d 752, 761 (9th Cir.2003).

When considering a Rule 50(b) motion, the court must view the evidence in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party. *Horphag Research, Ltd. v. Pellegrini,* 337 F.3d 1036, 1040 (9th Cir.2003). "Judgment as a matter of law is proper when the evidence permits only one reasonable conclusion and the conclusion is contrary to that reached by the jury." *Ostad v. Oregon Health Scis. Univ.,* 327 F.3d 876, 881 (9th Cir.2003). Because the court may not substitute its view of the evidence for that of the jury, it neither makes credibility determinations, nor weighs the evidence. *Costa v. Desert Palace, Inc.,* 299 F.3d 838, 859 (9th Cir.2002), *aff'd,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). Indeed, the court must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

## B. New Trial

 The court may grant a new trial "for any of the reasons for which new trials have heretofore been granted." FED. R.CIV.P. 59. Those reasons include when "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs,* 251 F.3d 814, 819 (9th Cir.2001) (quoting *United States v. 4.0 Acres of Land,* 175 F.3d 1133, 1139 (9th Cir.1999)). "While the trial court may weigh the evidence and credibility of the witnesses, the court is not justified in granting a new trial 'merely because it might have come to a different result from

that reached by the jury.' " *Roy v. Volkswagen of Am., Inc.,* 896 F.2d 1174, 1176 (9th Cir.1990) (quoting *Wilhelm v. Associated Container Transp. (Australia) Ltd.,* 648 F.2d 1197, 1198 (9th Cir.1981)).

## II. DISCUSSION

### A. Sierra's Entitlement to Fees

Sierra has moved for an award of attorney's fees based on the Court's conclusion—at the summary judgment stage—that FLIR lacked prudential standing to sue Sierra for false advertising under the Lanham since they are not competitors. FLIR opposes Sierra's motion for attorney's fees on the grounds that (1) Sierra is not entitled to fees under the applicable legal standard, (2) FLIR had substantial legal and factual support for claiming that Sierra was jointly and severally liable with Fluke for false advertising, and (3) it would be inequitable to award Sierra attorney's fees because Sierra failed to raise its contention that FLIR lacked prudential standing prior to summary judgment and Sierra admitted during discovery that Fluke voluntarily agreed to, and did in fact, pay Sierra's attorney's fees in this case.

 Section 35 of the Lanham Act permits an award of attorney's fees to a "prevailing party" in "exceptional cases." 15 U.S.C. § 1117(a). The Ninth Circuit has held that the exceptionality "requirement is met when the case is *either* groundless, unreasonable, vexatious, *or* pursued in bad faith." *Cairns v. Franklin Mint Co.,* 292 F.3d 1139, 1156 (9th Cir.2002) (citation and internal quotation marks omitted). Under § 1117(a), an award of attorney's fees is "never automatic and may be limited by equitable considerations." *Adidas Am., Inc. v. Payless Shoesource, Inc.,* No. 01–1655–KI, 2009 WL 302246, at *1 (D.Or. Feb. 9, 2009) (quoting *Rolex Watch,*

*U.S.A., Inc. v. Michel Co.,* 179 F.3d 704, 711 (9th Cir.1999)).

Sierra proceeds on the theory that FLIR's Lanham Act false advertising claim against it was groundless. As Sierra points out, FLIR opposed its motion for summary judgment by relying primarily, either directly or indirectly, on Second Circuit case law. In an Opinion and Order dated October 9, 2012, 903 F.Supp.2d 1120 (D.Or.2012), this Court agreed with Sierra's argument that FLIR's reliance on such cases was misplaced and tantamount to ignoring Ninth Circuit precedent in favor of the Second Circuit's directly conflicting standard. That decision was based upon the Court's reading of *Jack Russell Terrier Network of Northern California v. American Kennel Club, Inc.,* 407 F.3d 1027 (9th Cir.2005), where the Ninth Circuit stated that "different causes of action alleged pursuant to the different subsections of 15 U.S.C. § 1125(a) have different standing requirements." *Id.* at 1037. Under the "false association" prong of § 43 of the Lanhan Act, 15 U.S.C. § 1125(a)(1)(A), the parties are not required to be competitors "in the traditional sense." *Jack Russell,* 407 F.3d at 1031. By contrast, for standing pursuant to the "false advertising" prong of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), "a plaintiff must show: (1) a commercial injury based upon a misrepresentation about a product; and (2) that the injury is 'competitive,' or harmful to the plaintiff's ability to compete with the defendant." *Jack Russell,* 407

F.3d at 1037; *Barrus v. Sylvania,* 55 F.3d 468, 470 (9th Cir.1995) (explaining that standing under the "false advertising" prong requires a "commercial injury based upon a misrepresentation about a product, and also that the injury was 'competitive,' i.e., harmful to the plaintiff's ability to compete with the defendant.")[1]

This dichotomy is not present in the Second Circuit because, under its reasonable interest approach, "a plaintiff asserting a false advertising claim under § 43(a) need not be a 'competitor.'" *Phoenix of Broward, Inc. v. McDonald's Corp.,* 489 F.3d 1156, 1166 (11th Cir.2007) (citing *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1111 (2d Cir.1997)). Indeed, as the district court stated in *Grant Airmass Corp. v. Gaymar Industries, Inc.,* 645 F.Supp. 1507 (S.D.N.Y.1986), a case heavily relied upon by FLIR at the summary judgment stage, "[o]ur Court of Appeals has held that competitive injury is not required for recovery under section 1125(a)." *Id.* at 1511 (citation and internal quotation marks omitted).

FLIR claims that its reliance on Second Circuit case law was merely a good faith attempt to extend the law of this circuit, which should preclude a finding of exceptionality under the Lanham Act. The district court's decision in *Cairns v. Franklin Mint Co.,* 115 F.Supp.2d 1185 (C.D.Cal. 2000), and the Fifth Circuit's decision in *Procter & Gamble Co. v. Amway Corp.,* 280 F.3d 519 (5th Cir.2002), are instructive in this regard. In *Cairns,* the court con-

---

1. As now-Justice Alito explained in *Conte Bros. Automotive, Inc. v. Quaker State–Slick 50, Inc.,* 165 F.3d 221 (3d Cir.1998), the Ninth Circuit's approach will produce divergent results depending on which of § 43(a)'s prongs is at issue: "Applying this dichotomous approach, the Ninth Circuit has held that a plaintiff who alleged his name was replaced with that of another actor had standing to sue the movie's producer under the 'false association' prong even though he was not in competition with the producer. . . . On the other hand, a movie producer lacked standing under the 'false advertising' prong to bring a § 43(a) suit against various movie theaters who falsely described the movie as bearing an 'R' rating as opposed to a 'PG' rating because the parties were not competitors." *Id.* at 232 (internal citations omitted).

cluded that the plaintiffs' false endorsement claim was not "exceptional" under § 1117(a) of the Lanham Act, stating: "Although it is clear that this case was well outside the bounds of any previous decision, plaintiffs' claim could be considered an attempt to extend existing law." *Cairns,* 115 F.Supp.2d at 1188. The *Amway* court vacated and remanded the district court's award of attorney's fees under § 1117(a) on similar grounds: "The question of standing under the Lanham Act to sue for an illegal pyramid scheme was difficult and novel. A party that predicates its legal claim on a controversial and unsettled legal theory should not face sanctions under … § 1117(a) when the court ultimately rejects the claim." *Amway,* 280 F.3d at 531–32.

In a recent decision from the Central District of California, the district court explained that a Lanham Act claim "is considered legally groundless where there is 'no legal basis' for the claim itself, which instead rests on 'absurd' or 'just short frivolous' contentions of law." *Brown v. Elec. Arts, Inc.,* 722 F.Supp.2d 1148, 1152 (C.D.Cal.2010) (quoting *Cairns,* 115 F.Supp.2d at 1188–89). "[W]hen the Ninth Circuit has affirmed a denial of attorneys' fees based on a finding that the case was not exceptional, the key factors appear to be that the party against whom attorneys' fees are sought 'raised debatable issues' and had a legitimate reason for bringing its claims." *Icebreaker Ltd. v. Gilmar S.p.A.,* No. 3:11–cv–00309–BR, 2013 WL 638926, at *3 (D.Or. Feb. 20, 2013) (collecting cases).

Here, in addition to the contention that FLIR had no legal basis to pursue its claim, Sierra argues that FLIR's false advertising claim was factually groundless because FLIR knew Sierra was not its competitor. In the Court's view, however, it is apparent FLIR was attempting to rely on a legal theory that the Court determined was not sufficient to survive summary judgment (i.e., that Sierra was jointly and severally liable with Fluke), not assert that Sierra was in fact its competitor. Nor does the Court believe that FLIR engaged in bad faith or unreasonable conduct in pursuing its claim against Sierra. The Court will therefore limit its analysis to whether FLIR's Lanham Act claim was legally groundless.

Certainly the language used in this Court's October 9, 2012 Opinion and Order suggests a strong endorsement of Sierra's position. This was based, in large part, on FLIR arguing that "the principle on which Sierra relie[d]"—the competitive prong of *Jack Russell*—did not apply "where, as here, a co-defendant is jointly and severally liable with [the] plaintiff's competitor for false advertising," (FLIR's Resp. Opp'n Sierra's Mot. Summ. J. [Docket No. 194] at 7), and then proceeding to direct the Court's attention to Second Circuit case law without acknowledging that the Second Circuit and Ninth Circuit analyze the standing of commercial plaintiffs by applying differing standards (e.g., the reasonable interest approach versus the Ninth Circuit's so-called dichotomous approach).

■ Nevertheless, the Court cannot say that FLIR's Lanham Act false advertising claim was legally groundless or that it rested on "absurd" or "just short of frivolous" contentions of law. In fact, at the summary judgment stage, FLIR cited several cases that provided some support for its position, even though the cases were distinguishable from the present case. *See Coastal Abstract Serv., Inc. v. First Am. Title Ins., Co.,* 173 F.3d 725, 734 (9th Cir.1999) (concluding that injury was competitive under the Lanham Act since the defendant's corporate officer sought by his statements to divert business from the plaintiff to the defendant—which is type of

injury the Lanham Act was intended to remedy—and was not entitled to hide behind the corporation where he is an actual participant in the tort); *see also Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1021 (9th Cir.1985) ("A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf.") (internal quotation marks omitted). Accordingly, the Court denies Sierra's request for attorney's fees under § 1117(a) because this was not an exceptional case.

## B. FLIR's False Advertising Claim

In its motion for post-trial relief, Fluke asks the Court to adopt the jury's factual findings relating to Fluke's unclean hands defense and enter judgment for Fluke dismissing FLIR's false advertising claim.

### 1. Unclean Hands

FLIR sued Fluke for false advertising under the Lanham Act, alleging that a drop test video published by Fluke falsely depicted the abilities of both the FLIR and Fluke cameras to withstand a two-meter drop onto a concrete floor. The jury found for FLIR on that claim, but also found that FLIR falsely advertised its E-series cameras' ability to pass a two-meter drop test.[2] (Special Verdict Form [Docket No. 394] Interrog. No. 4 at 2.) Fluke requests that the Court adopt the jury's factual finding and hold that FLIR's false advertising claim with regard to the drop test video is precluded by its unclean hands. *See generally Bartee v. Michelin N. Am., Inc.,* 374 F.3d 906, 912–13 (10th Cir.2004) ("Pursuant to the Seventh Amendment to the Federal Constitution, in fashioning equitable relief, a district court is bound by a

jury's explicit findings of fact and those findings that are necessarily implicit in the jury's verdict. . . . [T]he subsequent findings by the trial judge in deciding the equitable claims [cannot] conflict with the jury's [explicit and implicit] determinations.") (internal quotations omitted).

As an initial matter, the parties dispute which evidentiary standard applies in evaluating an unclean hands defense. In the joint proposed jury instructions, FLIR's instruction on unclean hands did not reference any evidentiary standard, while Fluke's indicated that unclean hands must be proved by a preponderance of the evidence. *See Kelley Blue Book v. CarSmarts, Inc.,* 802 F.Supp. 278, 292 (C.D.Cal.1992) (applying a preponderance of the evidence standard to unclean hands; *see also Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 847 (9th Cir.1987) (not referencing any evidentiary standard). The instructions that went to the jury with respect to the evidentiary standard for unclean hands referenced the preponderance of the evidence. Ultimately, however, the Court decided that

> the best thing to do on th[e] issue [wa]s to . . . present a [special interrogatory] to the jury about whether the E–Series ad is false or not, and if they determine it is not, we don't have an unclean hands issue to worry about. If we do, we can unravel the[ ] arguments and make a decision about what it means with respect to the ultimate outcome of FLIR's claim. . . .

(Trial Tr. vol. 8b [Docket No. 415], 1853:11–18, Dec. 18, 2012.) In other words, it was ultimately determined that the equitable defense of unclean hands would be decided by the Court, and if the jury determined that FLIR did not falsely

---

**2.** The clear weight of the evidence supported the jury's finding.

advertise its E-series cameras' ability to pass a two-meter drop test, a finding of unclean hands would clearly be inappropriate because FLIR did not act inequitably.

After thoroughly reviewing the relevant case law post-trial, the Court has confirmed that it should apply the "clear, convincing evidence" standard enunciated in *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 833 (9th Cir.2011), in deciding whether the unclean hands defense was established and should result in the loss of FLIR's damages award. A finding by the jury that FLIR's E-series advertisements were false by a preponderance of the evidence leaves the Court to decide if that conduct was sufficiently inequitable to support an unclean hands defense. Had Fluke brought a false advertising claim based on FLIR's E-series advertisements, a preponderance of the evidence decision by the jury on the falsity of the advertisements would be enough. To block FLIR's claim, however, this conduct must be sufficiently egregious by clear and convincing evidence. This determination the Court reserved for itself.

Unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Adler v. Fed. Republic of Nigeria*, 219 F.3d 869, 877 (9th Cir.2000) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814,

65 S.Ct. 993, 89 L.Ed. 1381 (1945)).[3] The doctrine "bars relief to a plaintiff who has violated conscience, good faith or other equitable principles in his prior conduct, as well as to a plaintiff who has dirtied his hands in acquiring the right presently asserted." *Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981, 986 (9th Cir.2010) (internal quotation and citation omitted); *see also Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir.1985) (stating that "what is material is not that the plaintiff's hands are dirty, but that ... the manner of dirtying renders inequitable the assertion of such rights against the defendants.") (internal quotation marks omitted; brackets deleted).

In order to prevail on an unclean hands defense, "the defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims."[4] *Fuddruckers*, 826 F.2d at 847. The defense should only be applied "where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." *U–Haul Int'l, Inc. v. Jartran, Inc.*, 522 F.Supp. 1238, 1254 (D.Ariz.1981), *aff'd*, 681 F.2d 1159 (9th Cir. 1982) (citing *Ames Publ'g Co. v. Walker–Davis Publ'ns, Inc.*, 372 F.Supp. 1, 13–15 (E.D.Pa.1974)). In an action for false advertising, the unclean hands of the plaintiff must relate to the same type of product the defendant allegedly falsely advertised.

**3.** (*But cf.* FLIR's Resp. Opp'n Fluke's Mot. [Docket No. 440] at 11) ("FLIR's good faith is even more pronounced when compared to Fluke's intentionally false advertising.")

**4.** The district court's decision in *Infineon Technologies AG v. Volterra Semiconductor Corp.*, No C 11–6239 MMC, 2013 WL 1832558, at *4 n. 7 (N.D.Cal. May 1, 2013), also provides instructive guidance. There, the plaintiff argued that unclean hands only applies where a plaintiff acted with fraudulent intent. *Id.* The *Infineon* court disagreed, stating: "Although the doctrine of unclean hands requires a showing of more than negligence, [plaintiff] cites to no case holding such defense always requires a showing of fraud. Rather, the cases on which [plaintiff] relies are limited to the specific circumstances presented therein." *Id.* (internal citations omitted).

*Healthpoint, Ltd. v. Ethex Corp.*, 273 F.Supp.2d 817, 849 (W.D.Tex.2001). "[W]hile the Ninth Circuit has recognized that the extent of the harm caused by the plaintiff's misconduct is a highly relevant consideration, it has not held that a defendant asserting an unclean hands defense is *required* to demonstrate prejudice." *Lenz v. Universal Music Corp.*, No. C 07–3783 JF, 2010 WL 702466 *7 (N.D.Cal.2010) (internal quotation marks omitted) (emphasis added).

Fluke argues that the sufficiency of the relation between FLIR's conduct and its claim is demonstrated by the case law. To support its argument, Fluke relies primarily on *Stokely–Van Camp, Inc. v. Coca–Cola Co.*, 646 F.Supp.2d 510 (S.D.N.Y. 2009), and *Emco, Inc. v. Obst*, No. CV03–6432–R (RZX), 2004 WL 1737355 (C.D.Cal. July 29, 2004). In *Stokely–Van*, the court concluded, at the preliminary injunction stage, that the maker of Gatorade—who complained about Coca–Cola's claims regarding the presence of calcium and magnesium in Powerade—had unclean hands because it marketed the advantage of adding calcium and magnesium to its product first, only later to disavow that claim and assert that Coca–Cola must follow suit. *Stokely–Van*, 646 F.Supp.2d at 533–34. Similarly, in *Emco*, the court concluded that a Lanham Act claim was barred by unclean hands, where the counterclaimant-seller of industrial cutting tools, who used the brand name "Americut" and American symbols in advertisements for products that were not manufactured in the United States, alleged that its competitor misled its customers as to the geographic origin of its goods by removing country-of-origin labels. *Emco*, 2004 WL 1737355, at *4–5.

FLIR advances several arguments as to why an unclean hands finding would be inappropriate, including one that relates to Fluke's counterclaim concerning FLIR's practice of superimposing higher resolution images onto the liquid crystal display ("LCD") of lower resolution cameras in its advertisements. At the hearing on the parties' motions in limine, the Court made clear that FLIR's unclean hands defense could only pertain to Fluke's use of superimposed images in order to be sufficiently related to the subject matter of Fluke's counterclaim. In FLIR's view, a determination that it has unclean hands would be inconsistent with that ruling.

What FLIR neglects to mention, and what the Court addressed in denying one of FLIR's motions to compel discovery, is that many (if not all) of these advertisements "referred to both higher and lower resolution cameras." (Op. & Order on Mots. to Compel [Docket No. 190] at 12.) This is important because Fluke's false advertising claim based on FLIR's use of images in its advertisements was predicated almost exclusively, if not entirely, on advertisements where FLIR superimposed images produced by higher resolution cameras onto the view finder of lower resolution cameras that could *not* produce the images depicted on their view finders. The display of high resolution images (predominantly stand-alone images) in advertisements for cameras, some of which are capable of producing images of that resolution and some which are not, is quite different from superimposing high resolution images onto the view finders of only low resolution cameras incapable of producing the image. Indeed, the vast majority of the advertisements challenged by Fluke did not include any camera capable of producing the superimposed images.[5]

---

**5.** And of course the jury determined FLIR did not falsely advertise its cameras in this fash- ion.

FLIR also argues that (1) its conduct was not inequitable because it acted in good faith when it believed, more than six months in advance of its new E-series cameras being offered for sale to the public, that it could meet the two-meter drop test specification that it submitted for inclusion in the 2011 Grainger catalog; and (2) the advertisement of its E-series cameras in the 2011 Grainger catalog is not "related in any way, much less directly," to the drop test video and accompanying methodology because FLIR did not falsely depict the results of a particular drop test, deceptively compare FLIR's and Fluke's thermal imaging cameras, or deliberately include the "stamp of approval" of a purportedly "independent, third party" like Sierra. (FLIR's Resp. Opp'n Fluke's Mot. at 5, 7.)

The Court is not persuaded by FLIR's arguments. In this case, there is "clear, convincing evidence that [FLIR's] conduct was inequitable and related to the subject matter of [its] false advertising claims." *TrafficSchool*, 653 F.3d at 833 (internal citation and quotation marks omitted; brackets deleted). The jury was only asked and indeed found that FLIR falsely advertised the ability of its E-series cameras to pass a two-meter drop test, and that finding was supported by the evidence. Indeed, it was uncontroverted. (*See* Trial Ex. 1015 at 1) (email dated March 18, 2010, stating "[i]t will take some time before our complete volume line can do 2m drop."); (Trial Ex. 1126 at 4) (results from September 2010 drop test conducted by FLIR, indicating "[s]erious fail-

ures in every drop"); (Trial Ex. 1129 at 1) (internal email among high-ranking FLIR employees dated October 12, 2010, stating "at launch we don't we think we can have [a] camera that withstand[s] [a] 2m drop.")

At trial, FLIR attempted to explain the problem away by presenting evidence that it had developed a rubber boot that resolved any issues with the E-series' ability to withstand a two-meter drop test.[6] This boot was supplied to customers even though they were never informed prior to purchase of an E-series camera that the boot was necessary to survive a two-meter drop. However, FLIR's vice president of product management, Torbjörn Hamrelius ("Hamrelius"), testified that, even with the rubber boot, the E-series still failed its two-meter drop test. (Hamrelius Dep. 47:3–11.) This removes any doubt that FLIR's advertisement of its E-series cameras in the 2011 Grainger catalog (published in both print and online versions) falsely represented that they could withstand a two-meter drop test. And these false statements were disseminated to millions of potential customers, including two million individuals who received the catalog in hard copy form. (Trial Tr. vol. 2b [Docket No. 401], 415:6–8, 415:23–25, 416:1–15, Dec. 10, 2012.) Thus, FLIR falsely advertised its camera's ability to withstand a two-meter drop just as it alleged Fluke did with respect to various cameras' ability to withstand such a drop.

FLIR claims its good faith handling of this situation is demonstrated by its efforts to correct the print version of the 2011 Grainger catalog. "Grainger, however, in-

6. FLIR also claims that it "warranted the E-series cameras sold by Grainger against any damage from being dropped." (FLIR's Resp. Opp'n Fluke's Mot. at 10); (Hamrelius Dep. [Docket No. 382–1] 46:21–47:2) ("We ... *thought* that, of course, we will warrant-anyone that's come out and dropped the camera, we will, well, warrant it.") (emphasis added).

As Fluke notes, "[t]o the extent some actual warranty program was put into effect, it was never advertised to Grainger customers." (Fluke's Reply Mem. [Docket No. 450] at 9.) Without evidence that the warranty program was, in fact, put into effect and that customers were made aware of it, it is illusory.

formed FLIR that it was too late to remove the two-meter drop test specification because th[e] catalog had already gone to print." (FLIR's Resp. Opp'n Fluke's Mot. at 8–9.) As Fluke points out, "notably absent from the record is any evidence that FLIR ever attempted to ask Grainger to remove the two-meter drop specification from the Grainger *website*, which, presumably, would have been possible even if the catalog already had gone to print." (Fluke's Reply Mem. at 8); (Hamrelius Dep. 49:15–17) ("Well, at least we said we should [attempted to correct the online version]. I haven't checked that we actually did it."); (Trial Tr. vol. 2b, 427:25–428:3) ("Yeah, I don't think [Grainger] changed the ... language [on the website] because I think at that point we felt ... comfortable, with the [rubber boot] as a solution, that it met the requirements that were printed.") In fact, the two-meter drop specification was still available online in November 2011. (Trial Tr. vol. 2b, 422:25–423:20.)

The fact that the FLIR's advertisement in the 2011 Grainger catalog was not comparative does not make it any less related to subject matter of Fluke's drop test video. Both concerned the same product (a thermal imaging camera) and its ability to withstand a two-meter drop test. *See Stokely–Van*, 646 F.Supp.2d at 533 (applying unclean hands even though one advertisement was comparative and one was not); *see also Pom Wonderful LLC v. Welch Foods, Inc.*, 737 F.Supp.2d 1105, 1110 (C.D.Cal.2010) ("[T]he crux of [plaintiff's] Lanham Act claim is that [defendant] misleads consumers to believe that its [white grape pomegranate] product contains more pomegranate juice than it actually does, and that the [white grape pomegranate] product in fact contains very little pomegranate juice. Thus, to prove unclean hands, [Defendant] must demonstrate that [plaintiff] misleads consumers into believing its juice products contain more pomegranate juice than they actually do, or that its products misrepresent the amount of juice(s) in them."), *aff'd*, 468 Fed.Appx. 688 (9th Cir.2012).

Perhaps most importantly, FLIR's advertisement was in response to the advantage FLIR perceived Fluke to have in ruggedness, and which it expected Fluke to try and capitalize on. Fluke's capitalization was the drop test video. (Trial Ex. 1015 at 1) ("I've always felt the drop test exposes a vulnerability in our camera design and I have been surprised it has taken Fluke this long to expose this weakness.... Fluke is trying to play hardball and I would like to make them regret they ever made this [drop test] video."); (Trial Ex. 1027 at 1) ("Almost all tradeshows Fluke's distributor has no other sales pitch except the droop proof ability."); (Trial Ex. 1027 at 2) ("Seems that product management is also aware of [the drop test video] and that our cameras are indeed not built to withstand a 2 meter drop test.") Indeed, the FLIR advertisement came out after the false drop test video.

Moreover, the Court is not persuaded by FLIR's argument pertaining to the timing of its inequitable conduct. This is not a case where Fluke is attempting to "dredge up inequitable conduct of [FLIR] which has been discontinued for some time prior to the suit." *Pom Wonderful*, 737 F.Supp.2d at 1109 (quoting 6 *McCarthy on Trademarks & Unfair Competition* § 31:55 (4th ed. 2010)). FLIR made a representation to a major distributor in August 2010—the same month that this suit was filed—knowing at the time that it was not yet true. The failure of FLIR to ensure that its E-series cameras' could withstand the two-meter drop test led to the publication of a statement in the 2011 Grainger catalog that the jury determined was false—a finding that is consistent with

the testimony provided by Hamrelius—and for which FLIR offered no evidence the statement was ever true.

FLIR also suggests that the events related to its Grainger advertisements "were rectified prior to entry of judgment." (FLIR's Resp. Opp'n Fluke's Mot. at 12) (citing *McCarthy on Trademarks & Unfair Competition* § 31:55 (4th ed. 2012)). Setting aside the fact that neither party has cited, nor has research revealed, a case from the Ninth Circuit where an unclean hands defense was deemed unavailable based on contemporaneous conduct that ceased prior to entry of judgment, FLIR fails to cite evidence in the record showing this actually occurred. FLIR only points to: (1) a chain of emails from May 2011 (i.e., in the midst of this litigation), wherein FLIR's vice president of sales and marketing, Arpineh Mullaney, asked a Grainger representative for an opportunity to "refine" its catalog pages and FLIR's products manager, Mats Ahlström ("Ahlström"), drew a line through "~~drop proof (6.5 ft.)~~," (Trial Ex. 1075 at 1, 4); and (2) trial testimony provided by FLIR's president of commercial sales, Andrew Teich ("Teich"), where he discussed a drop apparatus developed in 2010 and concluded by stating that the E-series continued to function throughout the drops, although "early prototypes sustained some damage." (Trial Tr. vol. 7b [Docket No. 410], 1566:6–1569:19, Dec. 17, 2012.)

Even if the Court assumes Grainger altered FLIR's pages in the 2012 catalog in accordance with Ahlström's email, this still says nothing about the two million hard copy versions of the 2011 catalog that are presumably still in circulation. Nor does it explain why the drop test specification was still present on the Grainger website as late as November 2011. (Trial Tr. vol. 2b 422:25–423:1–20); (Trial Ex. 1084) (August 31, 2011 email indicating that FLIR did "d[id]n't know when" the E-series would be able to pass the two-meter drop test).[7]

In summary, the jury concluded that Fluke's drop test video constituted false advertising and awarded FLIR $103,000 in damages. Nevertheless, FLIR is not entitled to any damages in light of its false advertising related to the same subject matter. *See U–Haul Int'l,* 522 F.Supp. at 1254 (unclean hands should be applied "where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation.") In other words, FLIR's false advertising claim based on Fluke's drop test video being false regarding the ruggedness of various cameras in a two-meter drop test is barred, in light of FLIR's false advertising on the same subject matter, by the doctrine of unclean hands.[8]

### 2. Injunctive Relief

While FLIR may come with unclean hands, this does not foreclose the possibility it is entitled to injunctive relief:

> [W]here the law invoked by the plaintiff is really for the protection of the public, unclean hands is not a defense. That is, if the evidence shows that plaintiff is engaging in inequitable practices, but defendant is also guilty of the unfair competition charged, an injunction

7. The August 31, 2011 email refers to the E-series' ability to pass "without a boot." (Trial Ex. 1084.) As explained above, Hamrelius testified that, even with the rubber boot, the E-series still failed its two-meter drop test. (Hamrelius Dep. 47:3–11.)

8. Based on this finding, the Court concludes that FLIR is not entitled to an award of increased damages in connection with its false advertising claim.

should be granted notwithstanding the unclean hands maxim. It is better to remedy one wrong than to leave two wrongs at large. If defendant thinks that plaintiff is guilty of inequitable conduct, he should raise it in a counterclaim or in a separate suit against plaintiff. 6 *McCarthy on Trademarks & Unfair Competition* § 31:53 (4th ed. 2013). Fifty years ago, in *Republic Molding Corp. v. B.W. Photo Utilities,* 319 F.2d 347 (9th Cir.1963), the Ninth Circuit made similar observations:

> Unclean hands ... does not stand as a defense that may be properly considered independent of the merits of the plaintiff's claim.... Its assertion does not eliminate the need for the court to ascertain the soundness of the plaintiff's claim. In the interests of right and justice the court should not automatically condone the defendant's infractions because the plaintiff is also blameworthy, thereby leaving two wrongs unremedied and increasing the injury to the public. Rather the court must weigh the substance of the right asserted by plaintiff against the transgression which, it is contended, serves to foreclose that right. The relative extent of each party's wrong upon the other and upon the public should be taken into account, and an equitable balance struck.

*Id.* at 350.

Pursuant to 15 U.S.C. § 1116(a), the Court has the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, ... to prevent a violation of subsection (a), (c), or (d) of Section 43" of the Lanham Act. 15 U.S.C. § 1116(a). Here, the jury found that Fluke made a literally false statement in a commercial advertisement, that it was ma-

terial, and that it had a tendency to deceive the relevant purchasing public. (*See* Jury Instructions [Docket No. 395] at 24–26) (setting forth the elements of a false advertising under the Lanham Act). Rather than leave this wrong at large, the Court concludes that FLIR is entitled to an injunction. *See Nat'l Prods., Inc. v. Gamber–Johnson LLC,* 734 F.Supp.2d 1160, 1171 (W.D.Wash.2010) (granting injunction for the same reasons), *aff'd,* 449 Fed.Appx. 638 (9th Cir.2011).

In light of the declaration submitted by Zachary Field on May 3, 2013, which provides hyperlinks where the drop test video can still be found online, the Court disagrees with Fluke's contention that the voluntarily removal of the drop test video moots FLIR's claim for injunctive relief.[9] *See Polo Fashions, Inc. v. Dick Bruhn, Inc.,* 793 F.2d 1132, 1135 (9th Cir.1986). An injunction will be granted to FLIR. The Court will set a hearing at a later date to address the terms/ scope of FLIR's injunction.

### 3. Attorney's Fees and Costs

"The court in exceptional [false advertising] cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Whether a case is exceptional is question of law for the court, not the jury. *Watec Co., Ltd. v. Liu,* 403 F.3d 645, 656 (9th Cir.2005). According to the Ninth Circuit, "[i]t's not clear [whether an] award of attorney's fees [under the Lanham Act] is subject to equitable doctrines such as unclean hands." *TrafficSchool,* 653 F.3d at 833 n. 9. What is clear, however, is that district courts must do more than simply examine the relief awarded to plaintiffs in determining whether the case is exceptional; they must also consider whether the defendants' conduct was fraudulent, deliberate, or willful. *Id.* at 832.

---

**9.** The Court was still able to find the drop test video online in late-July 2013.

Citing *Shum v. Intel Corp.*, 629 F.3d 1360 (Fed.Cir.2010), Fluke claims that the Lanham Act envisions only one prevailing party since the plain language of § 1117(a) uses the singular of "party" and the definite article "the." *See* 15 U.S.C. § 1117(a) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party.") Relying primarily on the wording of Rule 54(d), *see* FED.R.CIV.P. 54(d) ("Unless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party."), the *Shum* court held that in patent cases there can be, "by definition," only one prevailing party, regardless of the fact that the outcome of a particular lawsuit might be mixed. *See Shum*, 629 F.3d at 1366–67.

As FLIR points out, "Fluke ... cites no Ninth Circuit or Lanham Act decisions in support of its contention that a suit must be viewed in its entirety and not on a claim-by-claim basis to determine whether a, or which, party prevailed." [sic] (FLIR's Reply Supp. [Docket No. 451] at 13.) The parties have not cited, and the Court's research has not revealed, controlling or persuasive authority addressing this specific issue. Fortunately, Congress has authorized the award of attorney's fees to "the prevailing party" in a number of statutes in addition to the Lanham Act. Cases interpreting other federal fee-shifting statutes provide meaningful comparisons. *See Ketterle v. B.P. Oil, Inc.*, 909 F.2d 425, 429 (11th Cir.1990) ("Many times the courts have used cases interpreting one fee shifting statute when faced with the interpretation of another.")

Under 42 U.S.C. § 1988, the court may award "a reasonable attorney's fee" to "the prevailing party" in various kinds of civil rights cases, including suits brought under § 1983.[10] In *Fox v. Vice*, —— U.S. ——, 131 S.Ct. 2205, 180 L.Ed.2d 45 (2011), the Supreme Court explained that a court can properly award fees to both parties under § 1988, despite its reference to "the prevailing party":

> In Hollywood, litigation most often concludes with a dramatic verdict that leaves one party fully triumphant and the other utterly prostrate. The court in such a case would know exactly how to award fees (even if that anti-climactic scene is generally left on the cutting-room floor). But in the real world, litigation is more complex, involving multiple claims for relief that implicate a mix of legal theories and have different merits. Some claims succeed; others fail. Some charges are frivolous; others (even if not ultimately successful) have a reasonable basis. In short, litigation is messy, and courts must deal with this untidiness in awarding fees.
>
> . . . .
>
> ... [W]e [have previously] noted the possibility that a plaintiff might prevail on one contention in a [civil rights] suit while also asserting an unrelated frivolous claim. In this situation, we explained, a court could properly award fees [under § 1988] to both parties—to the plaintiff, to reflect the fees he incurred in bringing the meritorious claim; and to the defendant, to compensate for the fees he paid in defending against the frivolous one. We thus made clear that a court may reimburse a defendant for costs under § 1988 even if a plaintiff's

---

10. There are similarities between Lanham Act and civil rights cases when it comes to awarding fees. *See, e.g., Harris v. Maricopa County Superior Court*, 631 F.3d 963, 987 (9th Cir. 2011) (Bybee, J., concurring in judgment in part, but mostly dissenting) (arguing that a Lanham Act fee case should have controlled in a civil rights case because the standard for exceptionality was analogous).

suit is not wholly frivolous. Fee-shifting to recompense a defendant ... is not all-or-nothing: A defendant need not show that every claim in a complaint is frivolous to qualify for fees.

*Id.* at 2213–14.

As the Supreme Court observed in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), a single civil rights lawsuit can contain distinctly different claims for relief that are based on different facts and legal theories, and as a result, "these unrelated claims [must] be treated as if they had been raised in separate lawsuits." *Id.* at 435, 103 S.Ct. 1933. In such circumstances, there is a real possibility that both parties could be a "prevailing party" entitled to attorney's fees under § 1988. *See id.* at 435 n. 10, 103 S.Ct. 1933 ("If the unsuccessful claim is frivolous, the defendant may [also] recover attorney's fees incurred in responding to it.")

These civil rights cases, of course, are distinguishable insofar as they did not involve a situation where both parties initially succeeded on the merits of a claim and/or were awarded injunctive relief by the court. They do demonstrate, however, that a federal fee-shifting statute's use of the definite article "the" and singular of "party" does not necessarily foreclose the possibility that there can be more than one prevailing party.

"Almost all cases under the [Lanham] Act ..., whether they are suits for trademark infringement or for false advertising, are between competitors." *Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC,* 626 F.3d 958, 962 (7th Cir.2010) (internal citations omitted). At times, these competitors "use Lanham Act litigation for strategic purposes—not to obtain a judgment or defeat a claim but to obtain a competitive advantage independent of the outcome of the case." *Id.* For example,

"[t]he owner of a trademark might bring a Lanham Act suit against a new entrant into his market, alleging trademark infringement but really just hoping to drive out the entrant by imposing heavy litigation costs on him." *Id.* With these strategic motivations at play, a single Lanham Act lawsuit can (and often times will) contain distinctly different claims for relief that are based on different facts and legal theories. That is precisely what took place here, and "these unrelated claims [should] be treated as if they had been raised in separate lawsuits." *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933.

■ Indeed, to be a prevailing party entitled to an attorney's fees award under the Lanham Act, the party must have achieved a material alteration in the legal relationship of the parties—i.e., relief that the would-be prevailing party sought, such as a monetary judgment and/or permanent injunctive relief—that is judicially sanctioned. *Fifty–Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.,* 915 F.Supp.2d 1179, 1183–84 (D.Nev.2013). When both parties advance some meritorious claim in a Lanham Act suit, they will inevitably satisfy the definition of a "prevailing party" unless there is a sufficient basis for denying a monetary judgment *and* permanent injunctive relief-a rare situation in Lanham Act litigation.

■ This does not mean that both parties would automatically qualify for an award of fees, but it does mean that court must undertake what appears to be a situation-specific exceptionality inquiry that turns on the nature of the conduct for which the opposing party was held liable or which was enjoined, and not, for example, on FLIR's conduct that barred recovery of damages or resulted in a damages award or injunction for Fluke on its claims. *See TrafficSchool,* 653 F.3d at 832–33

(holding that the district court applied the wrong legal standard by failing to consider the opposing party's conduct that warranted the grant of injunctive relief). For these reasons, the Court concludes that there can be more than one prevailing party in the same Lanham Act suit.

■ Here, the Court concludes that FLIR was a prevailing party on its claim and that this case was exceptional. *See Watec*, 403 F.3d at 656 (exceptionality is question of law for the district court). Importantly, although FLIR failed to recover damages, it obtained a judgment and injunction that is beneficial to consumers and "vindicate[s] [its] right to a 'market free of false advertising.'" *TrafficSchool*, 653 F.3d at 832 (quoting *Johnson & Johnson v. Carter–Wallace, Inc.*, 631 F.2d 186, 192 (2d Cir.1980)). Moreover, the Court finds that Fluke's conduct warrants the imposition of attorney's fees. There is no doubt that Fluke deliberately published a literally false advertisement.[11]

To prove literal falsity, FLIR only needed to demonstrate that the drop test "was not sufficiently reliable to permit one to conclude with reasonably certainty that the test established the proposition for which it was cited." *Riddell, Inc. v. Schutt Sports, Inc.*, 724 F.Supp.2d 963, 971 (W.D.Wisc.2010) (emphasis in the original) (citation and internal quotation marks omitted).[12] There was an abundance of evidence to support the conclusion that the drop test was not sufficiently reliable, including, among others: (1) Fluke used what was essentially a home-made drop apparatus; (2) Fluke did not subject its own comparable articulating camera to the drop test; (3) FLIR's cameras were placed in far more precarious positions on the drop apparatus; (4) Fluke's own employee extensively participated in what was supposed to be a test conducted by an independent third party; and (5) Fluke was never able to locate the Fluke Ti32 shown in the drop test video.

Accordingly, the Court will exercise its discretion and award attorney's fees and costs to FLIR. *See World Triathalon Corp. v. Dunbar*, 539 F.Supp.2d 1270, 1288 (D.Haw.2008) (concluding that a prevailing party was entitled to costs and attorney's fees under § 1117(a)); *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 702 (9th Cir.2008) ("An award of reasonable attorneys' fees and costs is expressly provided for in 'exceptional cases.'") FLIR is ordered to submit its fee application with appropriate supporting materials not later than August 19, 2013.

### 4. Prejudgment and Postjudgment Interest

FLIR seeks an award of prejudgment and postjudgment interest. (FLIR's Mot. Post–Trial Relief at 2); (*but cf.* FLIR's Reply Supp. at 1) ("FLIR requests that the Court ... award ... prejudgment interest.") FLIR does not specify whether its requests is limited to the jury's dam-

---

11. That is not to say that Fluke's primary purpose was to maliciously injure FLIR. Simply put, Fluke deliberately published an advertisement based on a test that was clearly not reliable (i.e., a literally false advertisement).

12. *See also Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir.1997) ("[A] competitor need not prove injury when suing to enjoin conduct that violates section 43(a). Thus, even if [a] [p]laintiff [ ] ... fail[s] to raise a triable issue as to causation and injury, [its] Lanham Act claim would still be viable to the extent it sought an injunction.") (internal citation and quotation marks omitted); *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 818–19, 825 (9th Cir.1996) (plaintiff was entitled to attorney's fees when district court only awarded an injunction).

ages award and/or an award of attorney's fees.

■ "In the Ninth Circuit, 'an award of prejudgment interest in a case under federal law is a matter left to the sound discretion of the trial court.'" *Cyclone USA, Inc. v. LL & C Dealer Servs., LLC,* No. CV 03–992, 2010 WL 2132378, at *1 (C.D.Cal. May 24, 2010) (quoting *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.,* 676 F.2d 1291, 1310 (9th Cir.1982)). The Court has determined that FLIR is not entitled to prejudgment interest in light of the applicability of an equitable defense and the lack of a damages judgment in FLIR's favor. *See Brittingham v. Jenkins,* 914 F.2d 447, 457 (4th Cir.1990) (reversing award of prejudgment interest on Lanham Act claim based on application of equitable defense).[13]

As to postjudgment interest, the governing statute provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). This language is mandatory, not discretionary. *See Air Separation, Inc. v. Underwriters at Lloyd's of London,* 45 F.3d 288, 290 (9th Cir.1995). "[T]he majority of the courts that have addressed the definition of the term 'money judgment' in § 1961(a) have held that a judgment that unconditionally entitles a party to reasonable attorney fees is [a] 'money judgment' contemplated by § 1961." *Boehner v. McDermott,* 541 F.Supp.2d 310, 322 (D.D.C.2008); *see also Auto. Club of New York, Inc. v. Dykstra,* No. 04 Civ. 2576(SHS), 2010 WL 3529235, at *5 (S.D.N.Y. Aug. 24, 2010) ("[O]ther circuits have held—correctly, in this Court's view—that prior to the date the amount of attorneys' fees is actually quantified, the damages are unliquidated and

therefore are not a 'money judgment' within the meaning of section 1961.")

If and when a judgment for attorney's fees is entered, the Court will address postjudgment interest.

### C. Fluke's Trademark–Related Claims

Fluke moves the Court for entry of a final judgment in its favor and against FLIR on its trademark-related claims. FLIR cross-moves for entry of a take-nothing judgment on Fluke's trademark-related claims on the grounds that those claims are barred by the doctrine of laches and/or because Fluke's "IR Fusion" trademark is invalid.

#### 1. Laches

■ Laches is an equitable defense to Lanham Act claims that "embodies the principle that a plaintiff cannot sit on the knowledge that another company is using its trademark [and confusingly similar terms], and then later come forward and seek to enforce its rights." *Internet Specialties W., Inc. v. Milon–Di Giorgio Enters., Inc.,* 559 F.3d 985, 989–90 (9th Cir. 2009). "[T]he existence of laches is a question primarily addressed to the discretion of the trial court." *Czaplicki v. Hoegh Silvercloud,* 351 U.S. 525, 534, 76 S.Ct. 946, 100 L.Ed. 1387 (1956). It is well settled that laches is a valid defense to Lanham act claims. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.,* 304 F.3d 829, 835 (9th Cir.2002). The test for laches is a two-part inquiry: first, did the plaintiff unreasonably delay in filing suit; and second, was the defendant prejudiced by the delay. *Internet Specialties,* 559 F.3d at 990.

---

**13.** FLIR cites *Brittingham* in support of its argument that Fluke's request for prejudg-

ment interest should be denied.

■ A court's "laches determination is made with reference to the limitations period for the analogous action at law." *Jarrow,* 304 F.3d at 835. This court has looked to the two-year statute of limitations for fraud claims, OR.REV.STAT. § 12.110, by analogy.[14] *Adidas America, Inc. v. Payless Shoesource, Inc.,* 540 F.Supp.2d 1176, 1180 n. 1 (D.Or.2008); *Johannsen v. Brown,* 797 F.Supp. 835, 839–40 (D.Or.1992); *Or. Ethiopian Cmty. Org. v. Gessesse,* No. 06–109–JE, 2007 WL 1887402, at *9 (D.Or. June 27, 2007).

■ The two-year laches period starts when the party "knew or should have known about its potential cause of action." *Internet Specialties,* 559 F.3d at 990. In this case, the jury determined that Fluke knew or should have known of its potential trademark-related claims by April 15, 2008. (Special Verdict Form, Interrog. 11 at 4.) Fluke did not pursue its trademark-related claims until after FLIR initiated this lawsuit in August 2010 and clearly after the two-year laches period had expired.

■ Ordinarily, "[a] presumption of both unreasonable delay and prejudice arises if a plaintiff files suit more than two years after the plaintiff knew or should have known of the alleged infringer's activity." *Adidas,* 540 F.Supp.2d at 1180. However, the presumption evaporates when there are "disputed issues of material fact as to when the [claimant] knew or should have known of the alleged infringer's activity, and thus whether the [claimant] filed suit outside the analogous statute of limitations period." *Adidas,* 540 F.Supp.2d at 1181; *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1037–38 (Fed.Cir.1992). At the summary judgment stage, the Court determined that

there was a genuine issue of fact as to whether Fluke filed its trademark-related claims outside of the laches period. *See generally Couveau v. Am. Airlines, Inc.,* 218 F.3d 1078, 1083 (9th Cir.2000) (stating that laches "is seldom susceptible of resolution by summary judgment.") The case law required little of Fluke to raise a material issue of fact with respect to FLIR's laches defense. The Court presented what it perceived to be a weak question of fact as to when Fluke knew or should have known of the alleged infringement. In any event, Fluke presented evidence in opposition to the laches defense resulting in FLIR being "required to affirmatively prove both elements of laches by a preponderance of the evidence." *Church & Dwight Co., Inc. v. Abbott Laboratories,* Civ. No. 05–2142, 2008 WL 5416383, at *5 (D.N.J. Dec. 23, 2008); *see also A.C. Aukerman,* 960 F.2d at 1038 ("Elimination of the presumption does not mean the [claimant] precludes the possibility of a laches defense; it does mean, however, that the presumption of laches plays no role in the ultimate decision. The facts of unreasonable delay and prejudice then must be proved [by a preponderance of the evidence] and judged on the totality of the evidence presented.") The Court is convinced that FLIR has done so here.

### a. Unreasonable Delay

■ The Court must balance six factors to determine whether Fluke's delay in filing suit was unreasonable: "(1) strength and value of the trademark rights asserted; (2) [the] plaintiff's diligence in enforcing mark; (3) harm to senior user if relief is denied; (4) good faith ignorance by junior user; (5) competition between senior

---

14. (*See* Joint Pretrial Order [Docket No. 370] at 3–4) (stipulation that FLIR is an Oregon corporation with its principal place of business in Oregon; this Court has jurisdiction over the case and parties; and Oregon law provides the governing law).

and junior users; and (6) extent of harm suffered by the junior user because of senior user's delay." *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 465 F.3d 1102, 1108 (9th Cir. 2006) (quoting *E–Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir.1983)). "While a court is guided by [the *E–Systems*] factors, ultimately, the doctrine of laches requires 'a consideration of the circumstances of each particular case and a balancing of the interests and equities of the parties.'" *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 311 F.Supp.2d 1023, 1030–31 (D.Or.2004) (citation omitted). Indeed, as Chief Judge Kozinski explained in his dissent in *American International Group, Inc. v. American International Bank*, 926 F.2d 829 (9th Cir.1991): "*E–Systems* contemplates more than simple bead-counting. The issue is not *how many* factors favor each party but their *weight.*" *Id.* at 838.

In this case, the balance tips in favor of FLIR. The timeline of events leading up to FLIR's filing of this suit and totality of the evidence at trial is instructive. On September 16, 2007, Fluke's senior product marketing manager, Michael Stuart ("Stuart"), sent an email to over sixty Fluke employees, stating: "On September 5th, [FLIR] officially introduced some new thermal imagers with what they say is 'F[LIR] Fusion.'" (Trial Ex. 173 at 1.) Seven months later, on April 15, 2008, Fluke's counsel, Heidi Sachs ("Sachs"), sent a cease and desist letter to FLIR's general counsel, William Davis ("Davis"), stating:

> It has come to our attention that F[LIR] recently commenced using IR FUSION for a camera that directly competes with Fluke's thermal imagers containing IR Fusion technology.... Such use constitutes an infringement of Fluke's state and federal trademark rights and a violation of unfair competition laws.

> ... [I]n an the interest of an amicable resolution of this matter, please confirm that F[LIR] will:

> 1. Immediately cease use of IR FUSION, or any confusingly similar mark....

> 2. Provide an accounting of the materials distributed, ... Fluke will determine whether corrective advertising is necessary to rectify this situation.

> 3. Confirm that F[LIR] will not use, register or seek to register IR Fusion or any confusingly similar mark....

(Trial Ex. 142.) The jury determined that Fluke knew or should have known of its trademark-related claims no later than the date of this cease and desist letter.

On April 22, 2008, Richard O'Brien ("O'Brien") of Sidley Austin LLP in Chicago, Illinois, responded to Sachs' letter, stating:

> FLIR disputes that 'IR–FUSION' is a valid trademark and disputes that it had made any use of that term in a trademark sense, versus a descriptive, generic, or other sense. Nonetheless, in order to avoid devoting further attention or incurring any expense with respect to this issue, FLIR has taken reasonable steps to avoid any use of the term 'IR–FUSION' in any way that could even be argued to be a trademark use. Specifically, FLIR has taken steps to remove all of the uses on its website of the term 'IR–FUSION' that existed at the time you sent your letter and has taken reasonable steps to recall and avoid further dissemination of any marketing materials that so use the term. We also assure you that although *FLIR plans to aggressively promote its own fusion functionality*, FLIR has no intention of registering 'IR–FUSION' as a trademark or domain name.

We trust that these steps bring this matter to an end.

(Trial Ex. 143) (emphasis added). It is clear on this record that Fluke knew FLIR contested the validity of the Fluke trademark and that FLIR intended to continue to promote its products' fusion functionality aggressively. All FLIR agreed to do was stop using the specific term IR Fusion. There is no evidence in the record before the Court of any communication by Fluke to FLIR about FLIR's positions as expressed in its April 22, 2008 response letter.

In December 2008, Fluke conducted a consumers survey that indicated that those surveyed "expect[ed]" thermal imagers to have "[f]usion," which they "[a]ttributed to F[LIR]," and found "NO differentiation in performance of [f]usion by brand." (Trial Ex. 146 at 32.) As noted *infra*, despite this knowledge both pre- and post-April 15, 2008, Fluke did not send its second cease and desist letter to FLIR until August 5, 2010—almost four months after the latest date the two-year laches period could have expired and not until after FLIR had expressed concerns regarding Fluke's drop test video.

In June 2009, Kirsten Paust ("Paust") became Fluke's general manager of thermography and started to "monitor the advertising that FLIR was doing that competed with" Fluke. (Trial Tr. vol. 6a [Docket No. 405], 1148:22–25, Dec. 14, 2012.) As Paust explained, "[i]t's just standard practice that anyone coming into this position ... would watch this stuff." (Trial Tr. vol. 6a, 1149:1–2.) During the remainder of that year, Paust observed that FLIR continued to run advertisements that contained the term "fusion" or a "derivation of fusion," as it said it would do in its April 22, 2008 response letter.

(Tr. Tr. vol. 6a, 1149:23–1150:3.) Over the course of the next year and a half, Paust was personally aware of at least ten FLIR advertisements where the term "fusion" was used. (Trial Tr. vol. 6b [Docket No. 409], 1275:3–22, Dec. 14, 2012.) Paust was not aware of any instances where FLIR used the term "IR–Fusion" post–2008, however. (Trial Tr. vol. 6b, 1273:1–3.)

Despite Paust's knowledge of FLIR's continued use of allegedly confusingly similar terms, and the results of the late–2008 Fluke consumer survey showing, in Fluke's view, arguable dilution of Fluke's trademark that it considered its most important intellectual property, Fluke did nothing further to protect itself.[15] Instead, Fluke appears to have set out on a course of almost vigilante-like punishment of FLIR. It decided to exploit its perceived ruggedness advantage and produce a comparative advertisement focused nearly exclusively on FLIR's less rugged cameras, the drop test video advertisement which the jury determined was false.

In late-January 2010, Sierra performed and filmed a drop test video involving five thermal imaging cameras: a Fluke Ti32; a FLIR i7, i60, and T400; and a Testo 880–3. Beginning in March 2010, Fluke published the video on Youtube, Facebook, and Twitter; made the video available to view and download on its website; and displayed the video at various trade shows.

In May 2010, FLIR hired outside counsel to look into Fluke's publication of the drop test video. (Trial Tr. vol. 2a [Docket No. 417], 282:15–18, 291:5–10, Dec. 10.2012.) Teich testified that in mid-July 2010 FLIR's "internal counsel had [the] external law firm ask Sierra Media ... for information about the video and to hold any documents that they had relative to"

---

**15.** The Court notes the survey could well be showing that the public never identified fusion with Fluke for reasons quite apart from infringement of the Fluke mark.

the drop test video. (Trial Tr. vol. 2a, 281:22–25, 282:5–6, 291:5–11); (Jury Trial R. [Docket No. 378], Ex. 1 at 72, 381:08–381:18, Dec. 10, 2012) ("Q. Now, [Mr. Cardenas,] how did you learn that [your company, Sierra Media,] was being sued over the—over the drop test video? A. Somebody from FLIR's counsel called me demanding I turn over all the footage. I had a brief conversation with the them a[nd]—basically I said, [n]o, it's not yours. You can't have the footage. They were insisting that I had to turn it over to them.")

Teich testified that he believes Sierra Media referred FLIR's mid-July 2010 request to Fluke's general counsel. (Trial Tr. vol. 2a, 282:19–24.) During the hearing on the post-trial motions, the Court asked the parties to submit record citations concerning Sierra Media's referral of FLIR's pre-litigation demand to Fluke's general counsel. FLIR pointed to Trial exhibit 2121, which was marked for identification, but not admitted into evidence, as demonstrating the basis for Teich's testimony. (Trial Ex. 2121) (indicating that FLIR's external counsel spoke with Sierra Media's president on July 2, 2010, and told him to contact Fluke's general counsel, whose contact information was provided, for assistance on July 11, 2010).

At trial, Fluke argued that FLIR never complained about its drop test video until after the second cease and desist letter. The following excerpt of counsel's opening statement on behalf of Fluke lays out this strategy:

> Now, the video played on March 10, 2010.
>
> And despite the fact that [FLIR's counsel] told you in his opening that we had to get that video off there, there was no letter in March complaining about the video. No call.

> There was no letter or call, the evidence will show, in April, the next month, from FLIR. No complaint at all.
>
> The evidence will show that there was no complaint or letter or call complaining about the video in May. Or in June. Or in July.
>
> And then on August 17th, 2010, FLIR filed the complaint that brought us here today.
>
> . . . .
>
> So you may be left asking yourself when you hear the evidence, well, how come this lawsuit?
>
> And I think [FLIR's counsel] showed you a piece of evidence that will be helpful for you to decide that. He showed you that letter that was sent to FLIR, complaining about the fact that they had stolen Fluke's trademark.
>
> And I don't know if you remember, but it was [dated] August 5th, 2010, just 12 days before they filed this complaint relating to this drop video about which they knew they had suffered no harm.
>
> We had already warned them, in 2008, about taking the trademark and using it.
>
> . . . .
>
> But then in 2010 the evidence will show they were at it again.
>
> And when we sent them a letter on August 5th, 2010, saying, if you don't stop it this time, we're going to have to sue you.
>
> They wanted, the evidence will show, the first strike. And so they filed this lawsuit. . . .

(Trial Tr. vol. 1b [Docket No. 400], 192:5–15, 193:7–18, 193:24–194:5, Dec. 7, 2012.)

As discussed above, the evidence supports a much different conclusion. With respect to the laches analysis, this evidence strongly suggests and the Court finds that rather than enforce its trademark, Fluke chose to ignore those rights

in favor of a frontal assault on the FLIR product line as less rugged than the Fluke thermal imagers, and the jury determined it did this with false advertising. Only when Fluke heard from its media and marketing company that it had received inquiries seeking preservation of documents regarding the drop test video did Fluke decide to seek protection for its trademark. This was more than two years after Fluke complained about any use of the term IR Fusion or fusion, and even longer since Fluke was first aware of FLIR's use of allegedly offending fusion-related terms. It was also well after FLIR expressed its clear intention to keep using the term fusion. The record is clear that Fluke knew throughout the latter half of 2008 and during 2009 that FLIR in fact continued using the term fusion as it said it would.

On August 5, 2010, Fluke sent its second cease and desist to FLIR, wherein Sachs only cited one example—a September 1, 2008 press release—of an alleged infringing use by FLIR that "appear[ed]" to (1) have been posted after FLIR's April 22, 2008 response to the original cease and desist letter and (2) "violate the representations" made therein. (Trial Ex. 144 at 1–2.) Nowhere in the letter does Sachs mention when she first became aware of the September 1, 2008 press release. Twelve days later, on August 17, 2010, after Fluke declined FLIR's proposed thirty-day standstill period to allow the parties an opportunity to resolve their differences, (Trial Ex. 1012 at 2), FLIR commenced this action, asserting federal and state law claims based on the drop test video, and seeking declarations of invalidity, non-infringement, and unenforceability of Fluke's IR Fusion trademark.

When presented with Fluke's December 2008 consumer survey and August 5, 2010 cease and desist letter, Fluke's own brand-ing expert, Dr. Erich Joachimsthaler ("Joachimsthaler"), testified at trial that Fluke was less than diligent in enforcing its mark:

Q. Does [Trial Ex. 146] demonstrate [that] in December of 2008 ... Fluke was aware that the marketplace viewed fusion technology as attributed to FLIR?

A. Yes.

(Trial Tr. vol. 5a [Docket No. 404], 1010:16–19, Dec. 13, 2012.)

Q. [Trial Ex. 144] is a letter that was sent in August of 2010. Correct?

A. Yes.

Q. And it's referencing the fact that ... Fluke found a use of the words 'IR–Fusion,' apparently by FLIR, in September of 2008?

A. Yes.

Q. Almost two years prior. Correct?

A. Yes.

Q. And in your opinion, is that proactively managing your valuable brand?

A. No. That's a big miss....

(Trial Tr. vol. 5a, 1013:4–15.) In a colloquy outside the presence of the jury, the Court confirmed what Dr. Joachimsthaler meant when he said, "[t]hat's a big miss":

THE COURT: Sir, I wanted to clear up the transcript in one respect. There were two or three times that you were asked a question and you gave an answer ... [regarding] the topic of waiting [over] two years to ... send a second letter [cease and desist letter] ... [a]nd you said something like, [t]hat was a big miss or big mess. Which were you saying ...?

THE WITNESS: It's . . . a big miss.

(Trial Tr. vol. 5a, 1033:25–1034:7.)

THE WITNESS: Yeah, it's a missed opportunity. . . .

(Trial Tr. vol. 5a, 1034:13.)

According to Teich, during that same time period, FLIR extensively marketed its own fusion functionality by using the term "fusion":

> During that period of time, [between April 2008 and August 2010], since we did not hear anything relative to the statement that we said that we were going to continue to aggressively promote our fusion functionality, we felt that Fluke would not have any objection to us using the term 'fusion.' So we invested a considerable amount of money in marketing FLIR fusion functionality during that period of time.
>
> Had we known that there was going to be an issue with that, we would have either resolved the issue at that time or chose some other means of marketing functionality [or not spent the money at all].

(Trial Tr. vol. 7b, 1605:12–23, 1606:9–10.) No evidence was presented contradicting the fact that FLIR invested a considerable amount of money in marketing its own fusion functionality.

In addition, Fluke only identified four instances at trial where FLIR used the term "IR Fusion," all of which were in small print on the specification page of the advertisement, and two of which indisputably occurred prior to the end of 2008. (*See* Trial Ex. 1101 at 2, using the phrase "IR Fusion Picture in Picture (PIP)," which was printed in about size 8 font in a FLIR press release dated September 1,

2008); (Trial Ex. 1227 at 12, FLIR advertisement stating "IR fusion picture in picture (PIP)," which is printed in about size 8 font); (Trial Ex. 1227 at 21, FLIR advertisement stating "IR fusion picture in picture (PIP)" in a similar font size); (Trial Ex. 1227 at 77, FLIR advertisement, copyright 2008, using the phrase "IR Fusion . . . Picture in Picture (PIP)—scalable IR image in visible light image" in an even smaller font size).

Based on the foregoing, the Court concludes that Fluke's delay in bringing suit was unreasonable. Fluke offered no credible explanation for its delay in light of its claim the IR Fusion mark is its most prized intellectual property. *See Danjaq LLC v. Sony Corp.,* 263 F.3d 942, 955 (9th Cir.2001) (holding that the unreasonable delay element of laches was satisfied because the claimant "offered no viable justification for the delay"); *see also Am. Int'l Group,* 926 F.2d at 834 (Kozinski, J., dissenting) ("Companies expecting judicial enforcement of their marks must conduct an effective policing effort.")

### b. Prejudice

FLIR must still satisfy the second prong of the laches test: prejudice from Fluke's unreasonable delay in bringing suit. *Internet Specialties,* 559 F.3d at 991.[16] The Ninth Circuit generally "recognizes two forms of prejudice in a laches context: evidentiary and expectations-based." *Evergreen Safety Council v. RSA Network, Inc.,* 697 F.3d 1221, 1227 (9th Cir.2012).

As described above, Fluke's delay here caused expectations-based prejudice because FLIR took actions or suffered consequences that it would not have, had Fluke "brought suit promptly." *Id.; cf.*

---

**16.** Conversely, in *Grupo Gigante SA De CV v. Dallo & Co., Inc.,* 391 F.3d 1088, 1101–05 (9th Cir.2004), the Ninth Circuit merged the two laches elements and considered prejudice under *E–Systems* sixth factor (harm suffered by the defendant because of the plaintiff's delay).

*Miller v. Glenn Miller Prods., Inc.,* 454 F.3d 975, 999 (9th Cir.2006) ("A defendant may establish prejudice by showing that during the delay, it invested money to expand its business or entered into business transactions based on his presumed rights.") Indeed, had Fluke "filed sooner," or at least explained that it objected to FLIR's use of the term fusion after receiving its April 22, 2008 response letter, FLIR *"may have* chosen an alternative marketing position." *Jarrow,* 304 F.3d 829 (citation omitted) (emphasis added). The Court rests its holding on, among other things, the public association that FLIR has built between the term fusion and its thermal imagers, as demonstrated (at its infancy) by Fluke's December 2008 consumer survey. *See Internet Specialties,* 559 F.3d at 992 (recognizing that a finding of prejudice can rest on a similar conclusion).[17]

Moreover, while expectation-based prejudice alone is sufficient, *see Petrella v. Metro–Goldwyn–Mayer, Inc.,* 695 F.3d 946, 953 (9th Cir.2012) ("We conclude that expectations-based prejudice exists here, so we need not consider evidentiary prejudice"), Fluke's delay also caused evidentiary prejudice. "Evidentiary prejudice includes such things as lost, stale, or degraded evidence." *Danjaq,* 263 F.3d at 955. At trial, Fluke's counsel took FLIR's secondary meaning survey to task, arguing that it lacked any evidentiary or legal significance as to the alleged invalidity of Fluke's trademark because it was conducted in early 2012—several years after the marketplace had been subjected to the effects of FLIR's trademark infringement. (*See, e.g.,* Trial Tr. vol. 6b,

1365:19–1366:21.) Based on the lack of an objection to FLIR's claim to be legitimately using the term fusion, and the use of that term from April 2008 through August 2010, it is hardly surprising that FLIR did not have a secondary meaning survey conducted until after Fluke filed its claim for trademark infringement.

As Fluke itself points out, "deficiencies in the timeliness of the survey ... goes to the weight afforded the survey." *Nightlight Sys., Inc. v. Nitelites Franchise Sys., Inc.,* No. 1:04–CV–2112–CAP, 2007 WL 4563873, at *9 (N.D.Ga. July 17, 2007). Which is why Fluke was adamant that the jury be provided an instruction indicating that timing is important because "the crucial date for determining whether a mark has secondary meaning through acquired distinctiveness 'is the date on which the alleged infringer entered the market with the disputed mark or term.' "[18] *Learning Internet v. Learn.com, Inc.,* No. CV 07–227–AC, 2009 WL 6059550 (D.Or. Nov. 25, 2009) (quoting *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.,* 419 F.3d 925, 928 (9th Cir.2005)). Fluke cannot argue to the jury on the one hand that this survey by FLIR is entitled to little weight given its timing, and later argue that FLIR's evidence was not negatively affected by the delay in its origination. The Court finds any delay and lesser weight to be given to FLIR's survey was factually due to Fluke's failure to object to FLIR's April 2008 response and assertion of its rights until August 2010.

The weight accorded to FLIR's survey was vital to its defense because, in the

---

**17.** The Court also notes that there is evidence in the record to support a conclusion that the result of the December 2008 Fluke consumer survey was as much or more due to FLIR's earlier development of the fusion functionality, as it was due to any FLIR advertising in

the 2008 time period after FLIR's April response to the first cease and desist letter.

**18.** Here there is evidence of FLIR's use of the term "FLIR Fusion" as early as September 2007. (Trial Ex. 173.)

Court's view, IR Fusion is at best a descriptive term that required the acquisition of secondary meaning in order to enjoy trademark protection. *See Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1058 n. 19 (9th Cir.1999) ("Descriptive terms directly describe the quality or *features of the product.*") (emphasis added); *Rudolph Intern., Inc. v. Realys, Inc.*, 482 F.3d 1195, 1197 (9th Cir. 2007) (descriptive terms generally do not enjoy trademark protection, unless they have acquired secondary meaning in the minds of consumers).

#### c. Willfulness Exception to Laches

Fluke claims that FLIR's "bad faith alone defeats its affirmative defense of laches." (Fluke's Opp'n FLIR's Mot. [Docket No. 443] at 30.) "Over the past eighty-five years, various courts have held that laches does not bar a suit against a deliberate infringer." *Danjaq*, 263 F.3d at 956. This willfulness exception has been applied by the Ninth Circuit in the trademark arena. *See id.* at 957 ("The attempted proof of laches is too trivial to require serious consideration. In the light of the intentional and fraudulent use of appellant's trade mark, the defense here is a frivolous one." (quoting *Nat'l Lead Co. v. Wolfe*, 223 F.2d 195, 202 (9th Cir.1955))). For the purposes of this exception, "the term 'willful' refers to conduct that occurs with knowledge that the defendant's conduct constitutes [trademark] infringement." *Id.* (internal quotation marks and citation omitted).

In this case, the evidence is insufficient to demonstrate that FLIR engaged in conduct with knowledge that it constituted trademark infringement. The record before the Court tells the following story. On April 15, 2008, outside counsel for Fluke wrote the first cease and desist letter to FLIR complaining of FLIR's use of IR Fusion and fusion. On April 22, 2008,

FLIR responded to Fluke stating that FLIR planned on aggressively promoting its own fusion functionality and agreeing to no longer use IR Fusion. FLIR's use of the term fusion, which it believed described a *feature* of its thermal imaging cameras, continued unabated (as Fluke was well aware) until August 2010, not long after FLIR asked Sierra Media to preserve and/or turn over evidence pertaining to the drop test video. Perhaps most tellingly, on July 1, 2010, before FLIR made its demand on Sierra Media, Fluke submitted an application to the United States Patent and Trademark Office ("PTO"), which stated the following:

> Those skilled in the art [of thermography] call th[e] merging of images 'fusion[.]' ... A variety of methods for presenting a thermal image fused with a corresponding visible light image are known in the art, one example of which is known as *FLIR Triple Fusion ...*, wherein an infrared image may be moved, resized and reshaped inside a visible light image.

(Trial Ex. 197 at 4) (emphasis added). Clearly FLIR did not knowingly engage in conduct that it believed constituted trademark infringement. *See Danjaq*, 263 F.3d 942 (willfulness exception inapplicable where party can "show at most only infringement, not willful infringement.")

In sum, the Court concludes that FLIR has demonstrated both an unreasonable delay and that it was prejudiced such that the laches defense applies here. Because Fluke's trademark-related claims are barred, the Court denies Fluke's request for the Court to enter judgment in its favor on those claims. Instead, judgment dismissing the trademark-related damages claims is appropriate.

#### 2. Injunctive Relief

"It has often been said that laches is generally not a bar to prospective injunc-

tive relief." *Jarrow Formulas,* 304 F.3d at 840. Often times "the defendant will not be prejudiced by a bar on future conduct" because "[l]aches stems from prejudice to the defendant occasioned by the plaintiff's past delay ... [and] the plaintiff's past dilatoriness is [typically] unrelated to a defendant's ongoing behavior that threatens future harm." *Id.* (citation omitted). "Injunctive relief is the remedy of choice for trademark ... cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1180 (9th Cir.1988). In the Court's view, prospective injunctive relief can be fashioned in such a way that will not prejudice FLIR and will protect Fluke against any continued use of its trademark. The Court will set a hearing at a later date to address the terms/scope of Fluke's injunction.

### 3. Attorney's Fees and Costs

■ For the reasons discussed *supra,* Part II.B.3., the Court will examine the relief awarded to Fluke and the unlawfulness of FLIR's conduct in assessing Fluke's request for attorney's fees under § 1117(a). "[G]enerally a trademark case is exceptional for purposes of an award of attorneys' fees when the infringement is malicious, fraudulent, deliberate or willful." *Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d 1400, 1409 (9th Cir.1993); *see also Watec,* 403 F.3d at 656 (exceptionality is question of law for the district court). In this case, the Court has determined that Fluke is entitled to an injunction which weighs heavily in favor of awarding attorney's fees. *See TrafficSchool,* 653 F.3d at 832 (citing cases where plaintiffs were entitled to attorney's fees when the district court awarded an injunction but not damages). As to the unlawfulness of FLIR's conduct, it will be considered at the time of the hearing on the terms of the injunction and

if fees are to be awarded, Fluke will then be directed to submit its fee application with appropriate supporting materials.

### 4. Prejudgment Interest

Fluke "requests that the Court order prejudgment interests on the $4,136,975 awarded by the jury." (Fluke's Mem. Supp. [Docket No. 434] at 20.) As stated in Part II.B.4., an award of prejudgment interest is a matter left to the discretion of the district court. *Cyclone USA,* 2010 WL 2132378, at *1. As with FLIR, the Court has determined that Fluke is not entitled to prejudgment interest since Fluke's trademark-related claims are barred by laches. *See Brittingham v. Jenkins,* 914 F.2d at 457 (reversing award of prejudgment interest on Lanham Act claim based on application of equitable defense).

### 5. Invalidity

In the alternative, FLIR argues that it is entitled to JMOL that Fluke's mark is invalid or, alternatively, a new trial on the issue of invalidity. In support of this assertion, FLIR claims that "IR Fusion" and "fusion" are "descriptive of the technological process of blending infrared and visible light images, and no secondary meaning exists with either of these terms." (FLIR's Mem. Supp. [Docket No. 436] at 34.)

Without deciding the issue, the Court notes that it has little difficulty concluding that "IR Fusion" is a descriptive term. "Descriptive terms directly describe the quality or features of the product." *Brookfield,* 174 F.3d at 1058. They convey "an immediate idea of the ingredients, qualities or characteristics of the goods." *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 11 (2d Cir.1976). Throughout the course of the litigation, Fluke has represented and the evidence

has clearly established that IR Fusion "signifies a *feature* that enables a handheld thermal imager equipped with a digital camera to overlay . . . a visible and thermal image." (Fluke's Resp. Opp'n FLIR's Mot. Summ. J. [Docket No. 200] at 2) (emphasis added). Indeed, Fluke's own survey in December 2008 indicates consumers consider fusion technology "table stakes" (i.e., a basic feature included on a thermal imager) and "expect products to have Fusion." (Trial Ex. 146 at 32.) The real issue, then, is whether Fluke proved "secondary meaning" at trial. *See Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 505–06 (9th Cir.2011) ("[A] descriptive mark that lacks secondary meaning is not distinctive and is not entitled to trademark protection.")

The Second Circuit faced similar circumstances in *PaperCutter, Inc. v. Fay's Drug Co., Inc.*, 900 F.2d 558 (2d Cir.1990). There, following a bench trial, the district court held that there was no infringement of the plaintiff's trademark, but upheld the registration of the mark because it had acquired secondary meaning. *Id.* at 559. On review, the Second Circuit granted the cancellation of the plaintiff's trademark because it failed to meet the burden of establishing that its descriptive mark had acquired secondary meaning. *Id.* at 565. The Second Circuit emphasized that (1) it had "no doubt" the plaintiff's trademark was purely descriptive; and (2) the "burden [to prove secondary meaning] d[id] not shift upon a decision of the [PTO] to register the mark, absent evidence that the [PTO] registered the mark upon finding that it had acquired secondary meaning." *Id.* at 563–64.

Here, the PTO registered the "IR Fusion" mark, without requiring proof of secondary meaning, in early June 2008. Thus, as in *PaperCutter*, Fluke bore the "burden of proving by a preponderance of

the evidence that [its] mark had acquired secondary meaning at the time [FLIR] began [its] allegedly infringing activities." *Morgans Group LLC v. John Doe Co.*, No. 10–CV–5225, 2012 WL 1098276, at *5 (S.D.N.Y. Mar. 31, 2012) (citation omitted). FLIR contends Fluke did not meet its burden.

Whether FLIR meets the standard for JMOL or a new trial on the issue of validity is a close issue. While Fluke presented some evidence on various factors considered for secondary meaning, significantly, a little over a year after Fluke became aware that FLIR "introduced some new thermal imagers with what [it said was] 'F[LIR] Fusion,'" (Trial Ex. 173 at 1), and just six months after the PTO registered the "IR Fusion" mark, Fluke conducted a survey which indicated that consumers expect thermal imagers to be equipped with fusion technology. *See Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1395 (9th Cir.1993) ("Consumer perceptions are relevant in determining whether a non-inherently distinctive mark has acquired secondary meaning and should therefore be treated as a strong mark.")

In order to "establish that a descriptive term has secondary meaning, the plaintiff *must show* that the primary significance of the term in the minds of the consuming public is not the product [or feature of the product] but the producer." *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1015 (9th Cir.1985) (emphasis added). If consumers considered fusion technology "table stakes," "expect[ed] products to have Fusion," and saw "NO differentiation in performance of Fusion by brand" in December 2008, (Trial Ex. 146 at 32), it seems highly unlikely that the significance of the term "IR Fusion" in the minds of the consuming public could have been anything other than a feature of the

product or any thermal imager a little over a year earlier.

FLIR's secondary meaning survey lends credence to this interpretation. "Many cases recite that proof of secondary meaning is sufficient if it shows that a 'significant' or 'substantial part' of the buying class use the designation to identify a single source." 6 *McCarthy on Trademarks & Unfair Competition* § 32:190 (4th ed. 2013). Although figures over 50% are regarded as clearly sufficient, figures of 46% and 37% have also been found sufficient. *Id.* In this case, FLIR's secondary meaning survey indicated that: (1) 34% of respondents associated the term "IR Fusion" with thermal imaging cameras; (2) 9% associated the term "IR Fusion" with Fluke; and (3) the measured level of secondary meaning in the term "IR Fusion" was only 7%. *See Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1358 (9th Cir.1985) ("An expert survey of purchasers can provide the most persuasive evidence on secondary meaning.") Even though FLIR's secondary meaning survey was conducted in early 2012, it seems doubtful that a "significant" or "substantial part" of thermal imager buyers used the designation to identify a single source in September 2007 or at any other time based on the evidence in this record. Fluke's own survey in December of 2008 showed "the buying class" considered fusion technology "table stakes" and "expect[ed] products [i.e., all thermal imagers] to have Fusion." "[T]he evidentiary burden necessary to establish secondary meaning is substantial where the mark applie[s] to an article designate[d] a principal ingredient desired by the [buying class]." *Aloe Creme Laboratories, Inc. v. Milsan, Inc.*, 423 F.2d 845, 850 (5th Cir.1970), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90 (1970).

Ultimately, however, given the record in this case, the laches defense discussed above is the clearest reason Fluke's damages award cannot be upheld. The laches analysis (1) moots the closer question of whether Fluke established secondary meaning for its mark; (2) accounts for any prejudice FLIR may have suffered in defending itself; and (3) allows the Court to address Fluke's injunctive relief claim as an appropriate framework to address the protection Fluke may be entitled to, and FLIR's ability to promote its own fusion technology. Thus, it is not necessary to rule on whether FLIR is entitled to JMOL that Fluke's mark is invalid or a new trial on the issue of invalidity.

### D. Fluke's Remaining False Advertising Claims

The jury found that two FLIR advertisements—"T-Series Line Up, Comparison to the Fluke Ti32," (Trial Ex. 1171), and "Why FLIR for Architectural Testing?," (Trial Ex. 1183)—were false in violation of the Lanham Act. (Special Verdict Form at 6, Interrogs. 19–20.) Fluke therefore argues that it is entitled to entry of judgment and permanent injunctive relief with respect to those advertisements. FLIR, on the other hand, argues that the Court should not issue any injunctive relief to Fluke because (1) Fluke presented no evidence at trial demonstrating the scope of FLIR's use of these two PowerPoint presentations, such as where, when, or for how long those two promotional materials were actually disseminated to the public in interstate commerce; (2) the two PowerPoint presentations have copyright dates of 2009 and were intended to be used only for internal sales training purposes and not interstate commerce; and (3) FLIR has ceased all use of those two materials and instituted controls to prevent their further use and dissemination.

"[A] plaintiff is not automatically entitled to an injunction even if it proves its

affirmative claims." *Contessa Food Prods., Inc. v. Lockpur Fish Processing Co., Ltd.*, Civ. Nos. 98–8218, 99–4783, 2003 WL 25778704, at *7 (C.D.Cal. Jan. 29, 2003). As Fluke appropriately notes in opposition to FLIR's request for permanent injunctive relief with regard to the drop test video, a defendant's voluntary cessation of its alleged unlawful conduct moots the need for a permanent injunction, so long as the defendant's reform is irrefutably demonstrated and total. *See Polo Fashions*, 793 F.2d at 1135. According to FLIR's director sales in the United States, Brent Lammert ("Lammert"), "FLIR has instructed all its sales and marketing personnel that those two power point presentations may never be used again, to any extent." (Lammert Decl. ¶ 4.) Unlike the supposed cessation of the drop test video, the Court has not been provided with supplemental declarations citing examples that refute Lammert's statements. Accordingly, Fluke's claim for injunctive relief is now moot. *See Contessa*, 2003 WL 25778704, at *8 (stating that "the court finds that [the defendant]'s claim for injunctive relief is now moot, as the allegedly wrongful behavior cannot reasonably be expected to recur.")

### E. Renewed Motions for JMOL

Consistent with the prior rulings, the Court (1) denies FLIR's renewed motion for JMOL on Fluke's unclean hands defense; (2) denies Fluke's renewed JMOL on FLIR's false advertising claim; (3) denies Fluke's renewed JMOL on FLIR's laches defense; and (4) denies as moot FLIR's renewed motions for JMOL concerning laches and Fluke's entitlement to injunctive relief as to the two advertisements discussed in Part II.D., (*see* FLIR's Mot. Post–Trial Relief at 3.)

Fluke has also renewed its motion for JMOL on its false advertising claim re-

garding FLIR's use of superimposed imagery. Fluke's argument, in its entirety, is as follows: "[T]he jury's verdict ... is contrary to the evidence." (Fluke's Mem. Supp. at 26.) This argument is entirely unpersuasive. "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir.2002). Because substantial evidence supported the jury's verdict here, Fluke's renewed motion for JMOL is denied.

### F. Fluke's Redaction Request

On January 4, 2013, Fluke filed a notice of intent to redact the trial transcripts, and subsequently filed its redaction request on January 22, 2013. In that request, Fluke sought redaction of certain trial testimony regarding its sales and profits. FLIR's opposition to Fluke's request aptly summarizes the Court's position on this matter: "[T]he Court was clear ... [at] the start of trial that if the parties intended to seek to exclude the public from any part of the trial or would later seek to seal particular trial testimony or evidence, they would need to submit legal authority for that position. Fluke, however, failed to do so." (FLIR's Resp. Fluke's Redaction Request [Docket No. 426] at 2.) Fluke's redaction request is denied.

### III. CONCLUSION

For the reasons stated, Fluke's redaction request (Docket No. 422) is DENIED; Sierra's motion (Docket No. 431) for attorney's fees under § 1117(a) is DENIED; Fluke's motion (Docket No. 433) re: post-trial issues is GRANTED in part and DENIED in part; and FLIR's motion (Docket No. 435) for post-trial relief, judgment as a matter of law, or alternatively, for a

new trial is GRANTED in part and DE-NIED in part.

IT IS SO ORDERED.